UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGELA CLAIR, BONNIE MCDONALD, and MILEY-ISABELLA OIEN on behalf of themselves and those similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>PETER THOMAS ROTH, LLC; PETER THOMAS ROTH GLOBAL, LLC; PETER THOMAS ROTH LABS LLC, JUNE JACOBS LABS, LLC; JUNE JACOBS LABORATORIES, LLC,<br><br>                    Defendants. | Case No. _____<br><br>Unlimited Civil Case<br><br>Class Action Complaint for Fraud, Deceit, and/or Misrepresentation; Breach of Express and Implied Warranties; Unjust Enrichment/Restitution; and Violations of the Magnuson-Moss Warranty Act and the Consumer Protection Statutes of Florida, New York, and Washington<br><br>Jury Trial Demanded |

1.      Plaintiffs Angela Clair, Bonnie McDonald, and Miley-Isabella Oien bring this action on behalf of themselves and all others similarly situated against Peter Thomas Roth, LLC; Peter Thomas Roth Global, LLC; Peter Thomas Roth Labs, LLC; June Jacobs Labs, LLC; and June Jacobs Laboratories, LLC (collectively "Defendants") on behalf of themselves, the general public, and those similarly situated for common law fraud, deceit and/or misrepresentation, breach of express and implied warranties, unjust enrichment/restitution, and violations of the Magnuson-Moss Warranty Act and the consumer protection statutes of Florida, New York, and Washington. The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

2.      Defendants are large companies that manufacture, market, and sell skin care products under the brand name "Peter Thomas Roth." To increase their sales, Defendants trick consumers by making false claims about the capabilities of their products. Defendants do not disclose to consumers that their products are scientifically incapable of achieving the promised results.

3.       This case is about two of Defendants' product lines. First, Defendants market and sell a line of "Rose Stem Cell" products by tricking consumers into believing that the rose stem cells in the products are capable of improving and repairing the human skin. Second, Defendants market and sell a "Water Drench" line of products. Defendants falsely represent that the active ingredient in these products, hyaluronic acid, will draw moisture from the atmosphere into the user's skin, and will hold 1,000 times its weight in water, and that the Water Drench Products are capable of providing hydration and that the Water Drench Products are capable of providing hydration for up to 72 hours. Defendants have profited enormously from their false marketing campaigns, while their customers are left with overpriced, ineffective skin care products.

**Parties**

4.      Plaintiff Angela Clair maintains her permanent residence in New York, New York and resided there at all times relevant to the instant action.

5.      Plaintiff Bonnie McDonald maintains her permanent residence in Jacksonville, Florida, and resided there at all times relevant to the instant action.

6.      Plaintiff Miley-Isabella Oien maintains her permanent residence in University Place, Washington, and resided there at all times relevant to this instant action.

7.      Defendant Peter Thomas Roth, LLC is a New York limited liability company with its principal place of business in New York, New York.

8.     Defendant Peter Thomas Roth Global, LLC is a New York limited liability company with its principal place of business in New York, New York.

9.     Defendant Peter Thomas Roth Labs LLC is a New York limited liability company with its principal place of business in New York, New York.

10.     Defendant June Jacobs Labs, LLC is a Delaware limited liability company with its principal place of business in Moonachie, New Jersey.

11.     Defendant June Jacobs Laboratories, LLC is a Delaware limited liability company with its principal place of business in Moonachie, New Jersey.

12.     At all times herein mentioned, each of the Defendants was a member of, and engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of, said joint venture, partnership, and common enterprise.

13.     At all times herein mentioned, the acts and omissions of each of the Defendants concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

14.     At all times herein mentioned, each of the Defendants ratified each and every act or omission complained of herein. At all times herein mentioned, each of the Defendants aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and this action is a class action in which at least one member of the class is a citizen of a State different from the defendants

16.     This Court has personal jurisdiction over Plaintiffs because they each submit to the Court's jurisdiction.

17.     This Court has personal jurisdiction over each Defendant because they conduct substantial business in the District and thus have sufficient minimum contacts with the State of New York. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of New York. Defendants intentionally advertised their Products in the state of New York, and distributed products to New York knowing they would be sold at retail to consumers such as Plaintiff Angela Clair. Ms. Clair purchased products from both the Rose Stem Cell and Water Drench product lines in the state of New York based on Defendants' misrepresentations. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products provided to persons in the State of New York.

18.     This Court also has general personal jurisdiction over Defendants because each Defendant maintains its corporate headquarters in New York, New York. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of New York, including within this District.

## SUBSTANTIVE ALLEGATIONS

20.     The market for cosmetics is fiercely competitive. Cosmetics manufacturers continually attempt to gain market share by touting the latest ingredients in their products and marketing them as being capable of improving consumers' appearance.

21.     Even in an industry known for hype, Defendants' outrageous marketing practices stand out among those of their competitors. Defendants position themselves as being a "clinical" skin care brand backed by cutting-edge technology with significant benefits for consumers' health and physical appearance. As discussed below, Defendants' claims about their "technology" are not just hype; rather, they are demonstrably false.

22.     Operating under the brand name "Peter Thomas Roth," Defendants are large skin care companies that market, advertise and sell products such as skin creams, serums, and face masks to consumers.

23.     Defendants have positioned themselves in the "prestige" segment of the beauty market, as opposed to the mass market or drug store segment. Unlike mass market beauty products, which are sold at drug stores and discount stores, prestige beauty products such as Defendants' are marketed to higher income people and sold predominately or exclusively at department stores, such as Macy's and Nordstrom; specialty beauty stores like Sephora and ULTA; the television shopping channel QVC; and Defendants' website, www.peterthomasroth.com (the "Website"). Companies selling through the prestige segment channels can command much more money than they would be able to charge at discount stores. Accordingly, the higher cost combined with the more exclusive nature of the stores in which prestige brands operates to build a higher degree of trust amongst prestige beauty consumers in the promises and representations made.

24.     Defendants understand that consumers are concerned about looking youthful, reducing the appearance of wrinkles and fine lines on their faces, and maintaining healthy, clear skin. Defendants know that consumers are therefore willing to pay more for products that promise to make them look younger, keep their skin healthy, and reverse the signs of aging.

25.     Accordingly, Defendants have embarked on a long term advertising campaign to trick consumers into believing that many of their products contain cutting-edge scientific technologies that will offer younger, healthier skin, when Defendants know that their claims are false or misleading to reasonable consumers.

26.     This case is about two of Defendants' lines of products: the "Rose Stem Cell" line, and the "Water Drench" line.

**A.     Defendants Make False and Misleading Claims About Their "Rose Stem Cell" Line of Products.**

27.     Throughout the class period, Defendants have sold various products as part of their "Rose Stem Cell" line. These products include:

    a.   Rose Stem Cell Bio-Repair Gel Mask;

    b.   Rose Stem Cell Bio-Repair Precious Cream; and

    c.   Rose Stem Cell Bio-Repair Cleansing Gel.

(Collectively, the "Rose Stem Cell Products.")

28.     In addition, Defendants also sell a number of limited edition gift sets, travel kits, and sample sets ("Bundled Sets") that include one or more Rose Stem Cell Products. For example, Defendants frequently offer a "Mask-a-Holic" set that includes the Rose Stem Cell Mask as well as other face masks from Defendants' collection. Other Bundled Sets that included the Rose Stem Cell Bio-Repair Gel Mask include the Mask Frenzy, Meet Your Mask, and Mask Mashup kits. As many of the Bundled Sets are limited edition and/or sold at unique retailers, the complete list of all Bundled Sets containing one or more of the Rose Stem Cell Products is in the sole possession of Defendants.

29.     When designing Bundled Sets, Defendants typically package their products in boxes that have either a clear front that allow consumers to see the front of each of the products

contained inside, or they use boxes that show photographs or images of the jars and tubes of the products contained inside. Thus, when Defendants' include a product in a Bundled Set, consumers see the same marketing information for that product that they would see if they were viewing the product by itself. Similarly, Defendants typically print descriptions of each product on the back of the Bundled Set that are similar to the descriptions appearing on the back or side of the boxes for the full-size version of the product, so that consumers usually receive the same information about a product regardless of how the product is packaged.

     **1.**     **Defendants Falsely Represent to Consumers that the Rose Stem Cell Products Can Improve and Repair Human Skin.**

     30.     Throughout the class period, Defendants have engaged in a long term campaign to increase their sales of the Rose Stem Cell Products by tricking consumers into believing that the products can improve and repair human skin and that the products contain significant anti-aging and healing benefits. Defendants claim that these capabilities are due to the fact that the Rose Stem Cell Products contain rose "stem cells." As explained below, however, these representations are misleading and false.

     31.     First, throughout the class period, Defendants have held all the Rose Stem Cell Products out as containing "stem cells" from several varieties of roses. Consumers, who are typically familiar with the power of human "stem cells" to transform and heal the human body, understand rose "stem cells" to have similar regenerative, rejuvenating, and reparative functions.

     32.     Second, Defendants further trick consumers into believing that rose stem cells have similar capabilities as human stem cells by describing the products as capable of "Bio-Repair." In fact, throughout the class period, three Rose Stem Cell Products – the mask, cream, and cleanser – utilize the phrase "Bio-Repair" in their product name, and accordingly, the phrase is featured prominently on the front of the label for each, and as such, was also visible in any

Bundled Set in which they were sold. This use of the phrase "Bio-Repair" in the product's title, which appears in a large font, suggests to the consumer that the product is capable of repairing the body. The fourth product, another cleanser, uses the similarly evocative word "Repair" in its product title and on the front of its packaging.

33.     Third, Defendants' deceptive advertising campaign was furthered through a pattern of similarly misleading representations on the individual products in the line. In particular, Defendants consistent used language across the product line that was designed to communicate to consumers that the Rose Stem Cell Products, unlike ordinary beauty products, were ones that derived their skin-improving properties through unique scientific and technological advancements.

34.     For example, throughout the class period, on the front of the box and on the front of the jar itself, Defendants advertised the Bio-Repair Gel Mask as containing "five perfect rose stem cells" or "five perfect rose plant stem cells" and that, in the Product, "cutting-edge plant biotechnology isolates and replicates five perfect rose plant stem cells." The box and container for the mask also states that the product "helps reduce the look of fine lines & wrinkles." Thus, when read together, and with the other representations described in Paragraphs 30 through 32, consumers understand the product, and the rose stem cells therein, to be one that can "repair" wrinkles and fine lines and "replicat[ing]" lost skin cells through the use of advanced plant stem cell technology. An example of Defendants' representations is set forth below:



35.     The side instruction panel, which is typically read by consumers prior to purchase, also notes that the product can be used every day for "intensive repair," which reinforces consumers' belief that the product, and the rose stem cells therein, repairs the skin.

36.     The Rose Stem Cell Bio-Repair Gel Mask is frequently included in Defendants' Bundled Sets, where the representations set forth in Paragraphs 30 through 33 are featured on the front of those boxes as well.

37.     Moreover, at various points during the class period, Defendants also advertised on the front of the package that the Rose Stem Cell Bio-Repair Gel Mask is "reparative," and "regenerates" and "rejuvenates," which further contributed to the misconception. While Defendants appear to have slowly removed those words from some labels in some markets, likely in response to another pending lawsuit and a 2016 warning letter from the FDA, this minor change in no way cures the deceptive nature of the package because consumers understand "stem cells" to be reparative, restorative, regenerative, and rejuvenating and because the label is still misleading for the reasons set forth in paragraphs 30 through 33.

38.     The other Rose Stem Cell Products' boxes and containers have substantially similar representations and are equally misleading as the mask. For example, in addition to the

representations described in Paragraphs 32-33, on the front of the box and container for the Rose

Stem Cell Bio-Repair Precious Cream, Defendants highlight the fact that it contains "six rose

stem cells," and that the product will: "help renew and restore the look of skin," "firm," "tone,"

and "smooth the look of fine lines & wrinkles." Thus, as with the Stem Cell Bio-Repair Mask,

the Bio-Repair Precious Cream creates the impression in consumers that the rose stem cells

therein are capable of repairing and improving the skin.

39.     The two cleansers continue with the same theme. As with the mask and cream, the

front of the boxes and containers for the Rose Stem Cell Bio-Repair Cleansing Gel and the Hello

Kitty Rose Repair Cleansing Gel highlight the reparative nature of the products and the inclusion

of stem cells. In addition to the representations described in Paragraphs 30 through 33, the front

of the Bio-Repair Cleansing Gel package states that it contains "five perfect reparative rose stem

cells" to "help repair the signs of aging." The Hello Kitty cleanser also advertises that it

"repairs," renews, and is "reparative."

40.     Defendants' misrepresentations are not just limited to the packaging, but instead,

they have undertaken a long-term advertising campaign in which they utilize every opportunity

to ensure consumers see their Rose Stem Cell Products as ones that are scientifically designed to

improve skin through the use of stem cell technology.

41.     For example, throughout the class period Defendants have dedicated a special

section on their Website to the "Rose Stem Cell" collection. There, they make additional

representations about the renewing and restorative properties of the products, and in particular,

emphasize that the Bio-Repair Gel Mask contains "state-of-the-art, 21st century breakthrough

stem cell technology," that will "restore, revitalize and brighten." Moreover, throughout the class

period, the Website has featured photographs of the front of the Bio-Repair Gel Mask and Bio-

Repair Precious Cleansers therefore, makes the exact same representations described in Paragraphs 30 through 33. (*See, e.g.*, https://www.peterthomasroth.com/collections/rose-stem-cell/ (last accessed February 7, 2020).) Recently the cleansers were removed from the Website, but were featured as recently as December 2018. During that period, the Website also featured the front of the packages of those products.

42.    By designing their Website in this matter, Defendants ensure that consumers who research their products see these representations, and they ensure that consumers who shop for their products on Defendants' Website are motivated to purchase them.

43.    Defendants also work with their retailers to ensure that consumers are exposed to the representations regardless of whether they shop online or in person. For in person shoppers, at Defendants' instruction, retail stores make the boxes and containers available for consumers to view as they shop, and also prominently place photographs of the boxes and containers (which are provided by Defendants) on their websites for consumers to read.

44.    For online shoppers, Defendants work with their retail partners to ensure these representations appear prominently online. Retailers such as Nordstrom, Sephora, Ulta, and Macy's feature the pictures of the products, and many include additional descriptions along the lines of what is described in Paragraphs 30 through 33.

45.    For example, Sephora's website contains images of the Rose Stem Cell Bio-Repair Mask. (*See* https://www.sephora.com/product/rose-stem-cell-bio-repair-gel-mask-P386377 (last accessed February 7, 2020).) The description next to that image reiterates the representations on the container, stating that the product is a "Bio-Repair Gel" with "rose stem cell technology," "[c]utting-edge plant biotechnology," and "state-of-the-art breakthrough technology" to make the skin look more youthful. (*Id.*) Defendants have also created a video that

is displayed on Sephora's website; that video describes the Bio-Repair Gel Mask and notes that it contains "stem cells," which work "just like stem cells are supposed to do." [sic]

46.     Finally, in another marketing video that Defendants created for the Rose Stem Cell Products that has appeared on retailer websites throughout the class period, Defendants claim that Bio-Repair Gel Mask has "state of the art twenty-first century breakthrough stem cell technology," and that it is a "rejuvenating gel to stimulate cellular turnover for younger looking skin."

**2.     Defendants' Representations Regarding the Rose Stem Cell Products Are False.**

47.     Defendants representations regarding the Rose Stem Cell Products are false and misleading.

48.     While medical research has shown that ***human*** stem cells can provide tremendous health benefits to people under specific circumstances, there is absolutely no evidence that ***rose*** stem cells can provide such benefits. Plant stem cells cannot "repair," "rejuvenate," or "regenerate" human skin, as Defendants claim or imply. Nor can they "stimulate cellular turnover," as Defendants claim in their marketing video. Accordingly, Defendants' representations are false and misleading.

49.     Indeed, assuming that Defendants' Rose Stem Cell Products actually contain rose stem cells, those stem cells would be dead by the time consumers apply them to their skin. Plant stem cells are fragile and cannot survive the manufacturing, shipping, and storage to which the Rose Stem Cell Products are necessarily subjected. Dead stem cells—whether they are of the human or plant variety—are incapable of having any effect on plants, let alone humans. Accordingly, even if one were to assume that living rose stem cells could have some health benefit for humans—a false assumption—the Rose Stem Cell Products still would be completely

ineffective. The FDA has noted that the scientific community does not recognize any therapeutic benefit associated with plant stem cell therapy, and has issued warning letters to other companies that sell similar products, advising them that advertising such products are capable of promoting structural changes in skin is misbranding under the FDCA.

50.    Defendants' false marketing practices are an attempt to capitalize on the recent media attention that has been given to medical research of human stem cells, with the goal of confusing consumers and causing them to erroneously believe that they will receive significant health benefits by using the Rose Stem Cell Products.

**B.    Defendants Make False and Misleading Claims About Their "Water Drench" Line of Products.**

51.    Defendants sell various products as part of their "Water Drench" line. These products include:

    a.    Water Drench Cloud Cleanser;

    b.    Water Drench Hyaluronic Cloud Serum;

    c.    Water Drench Hyaluronic Cloud Cream;

    d.    Water Drench Hyaluronic Cloud Hydra-Gel Eye Patches;

    e.    Water Drench Hyaluronic Micro-Bubbling Cloud Mask; and

    f.    Water Drench Hydrating Toner Mist.

(Collectively, the "Water Drench Products.")

52.    Defendants also sell a number of Bundled Sets that include the Water Drench Products. For example, at various points during the class period, Defendants have packaged and sold samples of the (i) Water Drench Cloud Cleanser; (ii) Water Drench Hyaluronic Cloud Serum; and (iii) Water Drench Hyaluronic Cloud Cream, under the names "Water Drench Luxe

Kit" and "Get Drenched Kit." Sometimes Defendants package various Water Drench Products into Bundled Sets along with other products from their catalog. For example, Defendants currently sell a "Jet, Set Facial Kit!" that includes two Water Drench Products, and two other products manufactured and sold by Defendants. Other Bundled Sets that included at least one Water Drench Product include the Hyaluronic Happy Hour 2-Piece Kit, Peter's Super Trio, and the Must Have Vault 6-Piece Kit. As many of the Bundled Sets are limited edition and/or sold at unique retailers, the complete list of all Bundled Sets containing one or more of the Water Drench Products is in the sole possession of Defendants.

1.     **Defendants Falsely Represent to Consumers that the Water Drench Products Moisturize Skin by Drawing Large Quantities of Water from the Atmosphere Into the Skin.**

53.     Throughout the class period, Defendants have engaged in a long term advertising campaign that relies on false and misleading marketing to trick consumers into believing that the Water Drench Products contain unique moisturizing properties. Specifically, Defendants falsely represent that, because of the presence of hyaluronic acid in the Water Drench Products, the products are capable of drawing large quantities of water from the atmosphere into the user's skin, for long-lasting benefits. As explained below, however, these representations are misleading and false.

54.     First, throughout the class period, Defendants have marketed all of the Water Drench Products as super hydrating products that will drench consumers' skin with water. Each product in the line contains the phrase "Water Drench" in the title, and the packaging utilizes a water vapor cloud background image and light blue and white color scheme, to reinforce in consumers' minds the connection between clouds and Defendants' claims that the product will absorb water from the air.

55.     Second, on the front of the package for each Water Drench product, Defendants prominently feature the ingredient "hyaluronic acid." Defendants know beauty consumers are drawn to buzzy, scientific sounding ingredients, but Defendants then wildly misstate the benefits, if any, of this ingredient.

56.     Third, on each product Defendants then make misleading and false statements about the benefits of the hyaluronic acid, on each utilizing a variety of substantially similar representations designed to trick consumers into believing that hyaluronic acid is capable of drawing large quantities of water from the atmosphere into the user's skin, for long-lasting benefits.

57.     For example, throughout the class period, the front of the box for the Water Drench Cloud Cream states that the product contains a "30% hyaluronic acid complex" that "draws atmospheric vapor." The product also advertises that it "helps lock in hydration for up to 72 hours." Also on the package, Defendants make a series of false representations about how the hyaluronic acid will deliver "water drenching benefits to the consumer, stating:

> Drench your skin with a liquid cloud of pure, endless moisture drawn right from the atmosphere. This concentrated 30% Hyaluronic Acid complex transforms atmospheric vapor into fresh, pure water from the clouds, providing your skin with a continuous burst of intense hydration that lasts up to 72 hours. Three molecular sizes of Hyaluronic Acid, a potent hydrator that constantly attracts and retains up to 1,000 times its weight in water from moisture in the atmosphere, helps replenish skin to make it appear more supple, full and smooth. ProHyal+ helps improve hydration for healthier-looking skin. The appearance of fine lines and wrinkles is visibly reduced, leaving a silky, hydrated and more youthful-looking complexion.



58.    As with the Water Drench Cream, the blue and white packaging for Defendants'
Water Drench Hyaluronic Cloud Serum also tricks consumers into believing that the hyaluronic
acid in the product can deliver long lasting, hydrating benefits. That product is advertised as
containing a 75% hyaluronic acid complex on the front, and Defendants also state on the
package: "An invisible veil of hydration attracts up to 1,000 times its weight in water from
moisture in the atmosphere," and that this "[h]elps replenish the appearance of aging and
dehydrated skin with vital moisture, imparting a look of youthful radiance."

59.    Along the same lines, the front of the blue and white box for Defendants' Water
Drench Cloud Cream Cleanser emphasizes the inclusion of the hyaluronic acid and that it "draws
water vapor from the clouds to help lock in moisture." The package also states that it "draws
water vapor from the clouds" states that "Hyaluronic Acid attracts and retains up to 1,000 times
its weight in water from the moisture in the atmosphere." As with the other products, these
representations lead consumers to believe that the cleanser will deliver significant moisturizing
benefits.

60.     Similarly, the box for Defendants' Water Drench Hyaluronic Micro-Bubbling Cloud Mask touts the supposed benefits of hyaluronic acid, claiming that it "attracts and retains up to 1,00 times its weight in water from the clouds." The front label further claims that the product is "hydrating," "oxygenating," and "draws water and oxygen from atmospheric vapor." Combined with the product's blue and white packaging, these representations seek to persuade consumers that the mask, and the hyaluronic acid contained therein, is capable of providing exceptional hydration.

61.     Defendants also advertise similar claims on the box of their Water Drench Hydrating Toner Mist. The product's front label claims that "hyaluronic acid draw pure atmospheric vapor" and that the product "provides up to 72 hours of hydration." Additionally, the product's packaging contains background cloud imagery, further suggesting that the product is capable of drawing moisture from the clouds.

62.     Finally, as with the other products in the line, the blue and white box for Defendants' Water Drench Hyaluronic Cloud Hydra-Gel Eye Patches also makes false representations about the benefits of hyaluronic acid. That product is labeled as "Hyaluronic Cloud" on the front. The product packaging also states that the product "[h]elps hydrate, moisturize and instantly improve the look of fine lines, crow's feet and under-eye darkness with pure, plumping water vapor continuously drawn from the clouds." And the box further states that "[m]ultiple sizes of Hyaluronic Acid attract and retain up to 1,000 times their weight in water from moisture in the atmosphere to lock in hydration."

63.     Defendants' misrepresentations are not just limited to the packaging, but instead, they have undertaken a long term advertising campaign in which they utilize every opportunity

to ensure consumers see their Water Drench Products as ones that are capable of drawing large quantities of water from the atmosphere into the user's skin, for long-lasting benefits.

64.     For example, throughout the class period Defendants have dedicated a special section on their Website to the "Water Drench" collection. The page opens with "Drench your skin with a liquid cloud of pure, endless moisture drawn right from the atmosphere," showing that Defendants intend for consumers to believe the products can hydrate skin by drawing in moisture from the clouds.

65.     In addition to prominently featuring photographs of the Water Drench Products' containers, the website contains descriptions of the products that mirror the representations on the boxes. (See, e.g., https://www.peterthomasroth.com/ water-drench-hyaluronic-cloud-cream-1801012.html (last accessed February 7, 2020).)

66.     By designing their Website in this matter, Defendants ensure that consumers who research their products see these representations, and they ensure that consumers who shop for their products on Defendants' Website are motivated to purchase them.

67.     Defendants also work with their retailers to ensure that consumers are exposed to the representations regardless of whether they shop online or in person. For in person shoppers, at Defendants' instruction, retail stores make the boxes and containers available for consumers to view as they shop, and also prominently place photographs of the boxes and containers (which are provided by Defendants) on their websites for consumers to read.

68.     For online shoppers, Defendants work with their retail partners to ensure these representations appear prominently online. Retailers such as Nordstrom, Sephora, ULTA, and Macy's feature the pictures of the products, and many include additional descriptions along the lines of what is described in Paragraphs 53 through 56.

69.     For example, Sephora's website contains images of the Water Drench Products' containers. (See, e.g., https://www.sephora.com/product/water-drench-hyaluronic-cloud-cream-P415701 (last accessed February 7, 2020).) The description next to those images reiterate the representations on the Water Drench Products containers and boxes.

70.     Defendants have also created marketing videos that appear on YouTube, the Website, on various social media sites, and next to the product listing on their retailers' websites. These videos typically feature Mr. Peter Thomas Roth or spokespeople who repeat the claims that are being made on the packaging for the Water Drench Products.

71.     For example, in one video regarding the Cloud Serum, Mr. Roth states: "Hyaluronic acid absorbs 1,000 times its weight in water from the vapors, from the moisture in the air, from the clouds. So it's up in the clouds, they're coming down into the air and pulling it right in." In that video, Mr. Roth then purports to demonstrate how the product works by holding up two vials—one that contains something that is supposed to represent hyaluronic acid before being placed on the skin, and another that is supposed to represent the hyaluronic acid after it has been placed on the skin and has absorbed water. The second vial is far larger than the second, indicating that the hyaluronic acid has absorbed incredible amounts of water. Mr. Roth then says, "[t]hat's how your skin is going to feel. It's going to feel all moisturized from the water in the air, not creams and lotions on your face." He further says that after a consumer puts the product on her skin, "it's drawing 1,000 times its weight in water—75% hyaluronic acid—all day long into your skin."

72.     In a video regarding the Cloud Cream, Mr. Roth makes substantially identical representations. In that video, however, Mr. Roth does not disclose that the vials he is holding up do not actually contain hyaluronic acid. In fact, as he holds up the vials, he says "this is

hyaluronic acid without water; this is when it's exposed to water." Then he says, "can you imagine how moist your face is going to be, just from water in the atmosphere, vapors in the atmosphere? You're going to put this on, you're going to look younger, your face is going to be moisturized all day long." (See https://www.youtube.com/watch?reload=9&v=TIhqaxeYVKs (last accessed February 7, 2020).)

73.     Defendants also encourage their retailers to provide such promotional videos to their customers. On the Sephora webpage for the Water Drench Cloud Cream, a Peter Thomas Roth spokesperson discusses how the product draws in moisture from the atmosphere and holds 1,000 times its weight in water. She too holds up vials that purport to be hyaluronic acid, and hyaluronic acid after being exposed to water, but does not inform people that what is inside is another product. (See https://www.sephora.com/product/water-drench-hyaluronic-cloud-cream-P415701 (last accessed February 7, 2020).) Other videos like this appear all over the internet in connection with advertisements for the Water Drench Products.

**2.     Defendants' Representations Regarding the Water Drench Products Are False.**

74.     Defendants' representations regarding the Water Drench Products are false and misleading.

75.     Defendants represent that the hyaluronic acid in their Water Drench Products can attract, absorb, and retain 1,000 times its weight in water. That representation is false. As is uniformly confirmed by the peer-reviewed scientific articles that have examined the hyaluronic acid's ability to bond to water, hyaluronic acid is incapable of attracting, absorbing, or retaining anywhere near 1,000 times its weight in water, even when it is in its anhydrous (i.e., waterless; completely dry) form.  At least nine different academic labs have examined hyaluronic acid's water retention, and they unanimously report that hyaluronic acid is capable of retaining less

than its own weight in water.  One even noted that it was examining the ingredient specifically because of its touted hydrating benefits in the cosmetics industry.  The investigators concluded that hyaluronic acid had no significant ability to retain water compared to other polysaccharides.

76.    Further, the hyaluronic acid contained in the Water Drench Products is not in its anhydrous form. Rather, it is already saturated with water. Indeed, the first ingredient in the Cloud Serum, Cloud Cream, and Cloud Hydra-Gel Eye Patches is water. Because the hyaluronic acid contained in these products is already water-saturated, it is incapable of absorbing any additional water at all, let alone "attract[ing] and retain[ing] up to 1,000 times its weight in water from moisture in the atmosphere," as Defendants claim.

77.    The only Water Drench Product that does not contain water as its primary ingredient is the Cloud Cleanser. Nevertheless, Defendants' representations regarding the Cloud Cleanser's ability to absorb water from the atmosphere is equally false, because the product is designed to be mixed with water from the faucet before being applied to the face. Accordingly, by the time the cleanser reaches the face, it is already saturated with water.

78.    Further, even assuming that the hyaluronic acid in the Water Drench Products is capable of absorbing any additional water by the time it is applied to a consumer's face—an assumption that is unwarranted—Defendants' representation that the acid pulls water from the air or clouds is also false. That is because the acid would tend to draw water *out* of the skin, thereby achieving the *opposite* effect as the one the company advertises. Hyaluronic acid cannot pull water *only* from the air, as Defendants represent.

79.    Therefore, Defendants' representations on the Water Drench Products' packaging and on the Website (i.e., (i) that the hyaluronic acid in the Water Drench Products "attracts and retains up to 1,000 times its weight in water from moisture in the atmosphere"; (ii) that the

hyaluronic acid in the Water Drench Products "transforms atmospheric vapor into fresh, pure water from the clouds"; (iii) that the Water Drench Products provide skin "with a continuous burst of intense hydration that lasts up to 72 hours"; (iv) that the hyaluronic acid in Defendants' products "draws water vapor from the clouds to help lock in moisture"; and (v) that the Water Drench Products "transform[] atmospheric vapor into fresh, pure water from the clouds, providing your skin with a continuous burst of intense hydration that lasts up to 72 hours") are false.

**C.     Defendants Intend to Continue to Falsely Advertise the Water Drench and Rose Stem Cell Products.**

80.     The market for beauty and skin care is robust and continues to grow. Women increasingly have more disposable income, and thus are more likely to purchase more expensive brands, such as those sold by Defendants. Further, men increasingly are using beauty and skin care products. In addition, the ubiquity of social media has caused a surge in interest in looking young and camera-ready. Moreover, as the population ages, the interest in anti-aging products has grown.

81.     Defendants also know that the beauty industry is fiercely competitive. A number of brands compete in this space, and to gain market share and consumers, Defendants' strategy has been to compete on misrepresentations rather than product quality or price. Defendants' products are quite expensive – with most selling at retail for $50 or more. For example, as of August 16, 2019, the Bio-Repair Mask retails for $55 a jar, and the Water Drench cream retails for $52 a jar on Sephora's website. Thus, to command these high prices in a competitive market, Defendants rely on outlandish misrepresentations to sell the products.

82.     In recent years, beauty companies from Korea and Japan are increasingly introducing products in the U.S. market. These companies have been successful due to the fact

that they rely heavily on natural ingredients and representations about products found in nature, but do so in a more scientific approach. These new beauty industry competitors have also been responsible for a new approach to skin care, one that distinguishes between dehydrated skin, which should be treated with water-based moisturizing products, and dry skin, which gets treated with oil-based moisturizing products.

83.    To compete with this influx of new brands in an already competitive space, Defendants have tremendous incentive to continue to market the products at issue in this lawsuit. Both products rely on natural ingredients – roses, water, clouds; both rely on scientific representations – stem cells, acids. And by emphasizing how well the Water Drench products supposedly "hydrate", the products respond to the growing market demand for hydrating moisturizers that bring water, not oil, into the skin. And Defendants have a tremendous incentive to falsely advertise their Rose Stem Cell and Water Drench Products, as these products tap into consumers' increasing concerns over aging and interest in higher-end products.

84.    Not surprisingly, the Water Drench Products are among some of Defendants' best-selling products.

85.    Because of the interest in these kinds of products, Defendants are able to charge exorbitant amounts for their pseudo-science. Thus, given that Defendants' profits will likely grow from selling over-priced products to a growing market for skin care products, Defendants have an incentive to continue to make false representations.

**D.    Defendants Are Jointly Responsible for the Manufacture and Marketing of the Product.**

86.    Defendants jointly develop, manufacture, market, and sell the Rose Stem Cell Products and Water Drench Products throughout the United States, including through the Peter Thomas Roth website (https://www.peterthomasroth.com), the June Jacobs website

(https://www.junejacobs.com), and retail outlets like Sephora, Ulta, and the QVC home shopping television network.

87.     Defendants June Jacobs Labs, LLC and June Jacobs Laboratories, LLC are intimately involved in key aspects of the Peter Thomas Roth Defendants' business, including manufacturing, marketing, and product packaging for the Peter Thomas Roth line of cosmetics. Although the June Jacobs Defendants have their own line of cosmetics, the companies' primary business is to manufacture and promote the Peter Thomas Roth products. CEO Mr. Peter Thomas Roth routinely refers to the Peter Thomas Roth companies and the June Jacobs companies as operating under one umbrella to further the Peter Thomas Roth line of cosmetics. For example, Mr. Roth stated in an interview: "One of *my* biggest achievements was opening up June Jacobs Labs, our contract manufacturing facility for June Jacobs and Peter Thomas Roth. (https://www.beautyinthebag.com/wordpress/meet-june-jacobs-wellness-expert-ceo-and-founder-of-june-jacobs-skin-care/ (last accessed February 7, 2020) (emphasis added).) The lease of the June Jacobs manufacturing facility, on information and belief, is held by Peter Thomas Roth Labs, LLC. (*See* https://newyork.citybizlist.com/article/361738/growing-skin-care-company-commits-to-73000-sf-in-saddle-brook-nj (last accessed February 7, 2020).) CEO June Jacobs confirmed her companies' involvement in the planning of Peter Thomas Roth cosmetics. She stated that "[w]e have four full-time chemists that service the June Jacobs brand and the Peter Thomas Roth brand. … We have meetings where we discuss the pipeline of what we are going to be doing, for example, the first quarter, second quarter and third quarter of 2019." (https://www.beautyindependent.com/sephora-global-reach-june-jacobs-relevant/ (last accessed February 7, 2020).) Further, the Linkedin company profile for June Jacobs lists its sole location as 460 Park Avenue, 16th Floor in New York—the same location as the Peter Thomas Roth

Defendants. (*See* https://www.linkedin.com/company/june-jacobs-spa-collection (last accessed February 7, 2020).) In addition, the June Jacobs companies designed their website to steer traffic toward the Peter Thomas Roth website: the first words on the homepage of the companies' website, junejacobs.com are "PETER THOMAS ROTH," which is a link that leads directly to the Peter Thomas Roth website. (*See* https://www.junejacobslabs.com (last accessed February 7, 2020).) The June Jacobs website also has a Privacy Policy that refers to Peter Thomas Roth LLC as one of its "sister companies," and states that June Jacobs labs may share information about its' website visitors with Peter Thomas Roth LLC. (*See* https://www.junejacobs.com/jj-privacy-policy.html (last accessed February 7, 2020).)

**E.     Plaintiffs' Experiences**

88.     Plaintiffs are reasonably diligent consumers, and when they purchased Defendants' Products, they reasonably relied on Defendants' false representations.

**1.     Angela Clair**

89.     Plaintiff Angela Clair is a consumer who is interested in beauty products. She has been familiar with Defendants' brand for several years and has purchased various products sold by Defendants at Sephora.

90.     While browsing a Sephora store located in New York, New York in May 2017, Ms. Clair saw the Water Drench Hyaluronic Cloud Cream She saw the cream's packaging and container, and read the representations made on the labels. Among other things, she noted the "Water Drench" phrase in the product's title and she read the representations that (i) hyaluronic acid "attracts and retains up to 1,000 times its weight in water from moisture in the atmosphere"; (ii) hyaluronic acid "transforms atmospheric vapor into fresh, pure water from the clouds"; (iii) Water Drench Products provides skin "with a continuous burst of intense hydration that lasts up

to 72 hours"; (iv) hyaluronic acid "draws water vapor from the clouds to help lock in moisture"; and (v) the Water Drench Products "transform[] atmospheric vapor into fresh, pure water from the clouds, providing your skin with a continuous burst of intense hydration that lasts up to 72 hours."

91.    Ms. Clair reasonably understood these representations to mean that the Water Drench Hyaluronic Cloud Cream would be exceptionally hydrating on her skin. On the basis of these representations, Ms. Clair decided to purchase the Water Drench Hyaluronic Cloud Cream. On May 23, 2017, she paid $52.00 for the cream.

92.    After repeatedly using the Water Drench Hyaluronic Cloud Cream, Ms. Clair realized that it did not improve the hydration of her skin, let alone provide the significant amount of moisture that Defendants had represented. Although Ms. Clair initially felt that the cream was working, she soon determined that the product was not moisturizing her skin as promised.

93.    Had Ms. Clair known that *any* of Defendants' representations set forth in paragraph 90 above were false, she would not have purchased the Water Drench Hyaluronic Cloud Cream, or would have paid less for it.

94.    Additionally, on October 21, 2017 Ms. Clair purchased a Peter Thomas Roth "Meet Your Mask" set containing the Rose Stem Cell Bio-Repair Gel Mask from the same Sephora location. Ms. Clair read the representations on the product's labels, including the title of the product, and in particular, the inclusion of "stem cells", as well as the other representations that the product (i) is capable of "Bio-Repair"; (ii) contains "cutting-edge plant bio-technology isolates and replicates [rose plant stem cells]"; (iii) contains "five perfect reparative rose stem cells"; (iv) "helps reduce the look of fine lines and wrinkles"; and (v) "regenerates."

95.     Ms. Clair reasonably understood these representations to mean that the presence of rose stem cells in the Rose Stem Cell Bio-Repair Mask meant that it was capable of repairing and improving the human skin. She also understood that the Rose Stem Cell Bio-Repair Mask, and in particular, the stem cells contained therein, was capable of "bio-repair," and that the inclusion of stem cells meant that the mask would repair, regenerate, and rejuvenate her skin at the cellular level. On the basis of these representations, Ms. Clair decided to purchase the Meet Your Mask set containing the Rose Stem Cell Bio-Repair Gel Mask.

96.     Had Ms. Clair known that *any* of Defendants' representations set forth in paragraph 94 above were false, she would not have purchased the Rose Stem Cell Bio-Repair Gel Mask, or would have paid less for it.

97.     Ms. Clair continues to desire products that offer exceptional moisturizing and regenerative qualities, regardless of whether those products contain hyaluronic acid or rose stem cells. She desires to purchase other cosmetic products from retailers such as Sephora, and regularly visits stores where Defendants' products are sold. Without purchasing and having the products professionally tested or consulting scientific experts, Ms. Clair will be unable to determine if representations that Defendants make regarding the properties and features of hyaluronic acid, rose stem cells, and/or the moisturizing and regenerative properties of its products are true. Ms. Clair understands that the formulation of the Water Drench Products and Rose Stem Cell Products may change over time or that Defendants may choose to market other products with hyaluronic acid or rose stem cells that contain misleading representations about the product. But as long as Defendants may use inaccurate representations about the moisturizing capabilities of hyaluronic acid or the "Bio-Repair" properties of rose stem cells, then when presented with Defendants' packaging, Ms. Clair continues to have no way of determining

whether the representations regarding those capabilities are true. Thus, Ms. Clair is likely to be repeatedly presented with false or misleading information when shopping and unable to make informed decisions about whether to purchase Defendants' products unless and until Defendants are compelled to utilize accurate representations regarding the actual capabilities of hyaluronic acid and/or rose stem cells.

### 2.     Bonnie McDonald

98.     Plaintiff Bonnie McDonald is a consumer who is interested in beauty products. In or around April 2019, Ms. McDonald visited an ULTA store in Jacksonville, Florida where she was shopping for a moisturizer to improve the appearance and hydration of her skin. She saw the Peter Thomas Roth Water Drench Hyaluronic Cloud Cream Hydrating Moisturizer, and read the representations made on the Product's packaging. Among other things, she noted the "Water Drench" phrase in the product's title, and read the representations that (i) hyaluronic acid "attracts and retains up to 1,000 times its weight in water from moisture in the atmosphere"; (ii) hyaluronic acid "transforms atmospheric vapor into fresh, pure water from the clouds"; (iii) the Water Drench Products provide "a continuous burst of intense hydration that lasts up to 72 hours"; (iv) hyaluronic acid "draws water vapor from the clouds to help lock in moisture"; and (v) the Water Drench Products "transform[] atmospheric vapor into fresh, pure water from the clouds, providing your skin with a continuous burst of intense hydration that lasts up to 72 hours."

99.     Ms. McDonald reasonably understood these representations to mean that the Water Drench Product would be exceptionally hydrating on her skin. On the basis of these representations, Ms. McDonald decided to purchase the Water Drench Hyaluronic Cloud Cream Hydrating Moisturizer around April 2019.

100.    After repeatedly using the product, she realized that it did not improve the hydration of her skin, let alone provide the significant amount of moisture that Defendants had represented.

101.    Had Ms. McDonald known that *any* of Defendants' representations set forth in paragraph 98 above were false, she would not have purchased the Water Drench Hyaluronic Cloud Cream Hydrating Moisturizer or would have paid less for it.

102.    Ms. McDonald continues to want to purchase products that could help improve the appearance of her skin. She desires to purchase other cosmetic products from retailers such as ULTA, and regularly visits stores where Defendants' products are sold. Without purchasing and having the products professionally tested or consulting scientific experts, Ms. McDonald will be unable to determine if representations that Defendants make regarding the properties and features of its products are true. Ms. McDonald understands that the formulation of Defendants' Products may change over time or that Defendants may choose to market other products that contain misleading representations about the product. But as long as Defendants may use inaccurate representations about the capabilities of their products, then when presented with Defendants' advertising, Ms. McDonald continues to have no way of determining whether the representations regarding those capabilities are true. Thus, Ms. McDonald is likely to be repeatedly presented with false or misleading information when shopping and unable to make informed decisions about whether to purchase Defendants' products. Thus, she is likely to be repeatedly misled by Defendants' conduct, unless and until Defendants are compelled to utilize accurate representations regarding the actual capabilities of hyaluronic acid.

### 3.     Miley-Isabella Oien

103.     Plaintiff Miley-Isabella Oien is a consumer who is interested in beauty products. She has been familiar with Defendants' brand for several years and has purchased various products sold by Defendants at Sephora.

104.     While browsing the Sephora store located in Tacoma, Washington in February 2018, Ms. Oien saw the Water Drench Products. She saw the images of the Water Drench Cloud Cream Cleanser's packaging and container on the Website, and read the representations made there. Among other things, she noted the "Water Drench" phrase in the product's title and she read the representations that (i) hyaluronic acid "attracts and retains up to 1,000 times its weight in water from moisture in the atmosphere"; and (ii) that the product "draws water vapor from the clouds to help lock in moisture"

105.     Ms. Oien reasonably understood the representations in Paragraph 104 to mean that the Water Drench Products would be exceptionally hydrating on her skin. On the basis of these representations, Ms. Oien decided to purchase the Water Drench Hyaluronic Cloud Cleanser. On February 6, 2018, she paid $30.00 for the cleanser.

106.     On March 2, 2018, Ms. Oien also purchased for $55.00 the Water Drench Hyaluronic Cloud Hydra-Gel Eye Patches from the same Sephora location on the basis of the same representations detailed in Paragraph 104 as well as the representation that the product provides "pure, plumping water continuously drawn from the clouds." At the time of her purchase, Ms. Oien had not yet used the Water Drench Cloud Cleanser.

107.     Had Ms. Oien known that *any* of Defendants' representations set forth in paragraph 104 above were false, she would not have purchased the Water Drench Hyaluronic Cloud Cleanser, or would have paid less for it.

108.    Had Ms. Oien known that *any* of Defendants' representations set forth in paragraph 104 above were false, she would not have purchased the Water Drench Hyaluronic Cloud Hydra-Gel Eye Patches, or would have paid less for them.

109.    Ms. Oien also purchased Defendants' "Mask-a-Holic" set containing the Rose Stem Cell Bio-Repair Gel Mask in or around November 2015 from the same Sephora location. Ms. Oien read the representations on the product's labels, including the title of the product, and in particular, the inclusion of "stem cells", as well as the other representations, including that the product (i) is capable of "Bio-Repair"; (ii) contains "cutting-edge plant bio-technology isolates and replicates [rose plant stem cells]"; (iii) contains "five perfect reparative rose stem cells"; (iv) "helps reduce the look of fine lines and wrinkles"; and (v) "regenerates."

110.    Ms. Oien reasonably understood these representations to mean that the presence of rose stem cells in the Rose Stem Cell Bio-Repair Mask meant that it was capable of repairing and improving the human skin. She also understood that the Rose Stem Cell Bio-Repair Mask, and in particular, the stem cells contained therein, was capable of "bio-repair" and that the inclusion of stem cells meant that the mask would repair, regenerate, and rejuvenate her skin at the cellular level.

111.    On the basis of these representations, Ms. Oien decided to purchase the Mask-a-Holic set containing the Rose Stem Cell Bio-Repair Gel Mask.

112.    Had Ms. Oien known that *any* of Defendants' representations set forth in paragraph 109 above were false, she would not have purchased the Mask-a-Holic set, or would have paid less for it.

113.    Ms. Oien continues to desire products that offer exceptional moisturizing and regenerative qualities, regardless of whether those products contain hyaluronic acid or rose stem

cells. She desires to purchase other cosmetic products from retailers such as Sephora, and regularly visits stores where Defendants' products are sold. Without purchasing and having the products professionally tested or consulting scientific experts, Ms. Oien will be unable to determine if representations that Defendants make regarding the properties and features of hyaluronic acid, rose stem cells, and/or the moisturizing and regenerative properties of its products are true. Ms. Oien understands that the formulation of the Water Drench Products and Rose Stem Cell Products may change over time or that Defendants may choose to market other products with hyaluronic acid or rose stem cells that contain misleading representations about the product. But as long as Defendants may use inaccurate representations about the moisturizing capabilities of hyaluronic acid or the "Bio-Repair" properties of rose stem cells, then when presented with Defendants' packaging, Ms. Oien continues to have no way of determining whether the representations regarding those capabilities are true. Thus, Ms. Oien is likely to be repeatedly presented with false or misleading information when shopping and unable to make informed decisions about whether to purchase Defendants' products unless and until Defendants are compelled to utilize accurate representations regarding the actual capabilities of hyaluronic acid and/or rose stem cells.

## CLASS ALLEGATIONS

114.    Plaintiffs bring this action against Defendants, on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

**A.    The Rose Stem Cell Class**

115.    Plaintiffs Angela Clair and Miley-Isabella Oienseek to represent the "Rose Stem Cell Class" of persons, defined as follows:

All persons who, between August 27, 2015 and the present, purchased, in Florida, New York, and Washington any Rose Stem Cell Product.

116.    Plaintiff Angela Clair also seeks to represent a subclass of those members of the Rose Stem Cell Class who purchased any Rose Stem Cell Product in New York (the "New York Rose Stem Cell Subclass").

117.    Plaintiff Miley-Isabell Oien also seeks to represent a subclass of those members of the Rose Stem Cell Class who purchased any Rose Stem Cell Product in Washington (the "Washington Rose Stem Cell Subclass").

118.    Plaintiffs and members of the proposed class have been economically damaged by their purchase of the Product because the advertising for the Product was and is untrue and/or misleading under New York law; therefore, the Product is worth less than what Plaintiffs and members of the Class paid for them and/or Plaintiffs and members of the Class did not receive what they reasonably intended to receive.

119.    As a direct and proximate result of Defendants' unfair and wrongful conduct, as set forth herein, Plaintiffs and the class members: (1) were misled into purchasing the Product; (2) received a product that failed to meet their reasonable expectations and Defendants' promises; (3) paid a premium sum of money for a product that was not as represented and, thus, were deprived of the benefit of the bargain because the purchased product had less value than what was represented by Defendants; and (4) used a product that was other than what was represented by Defendants and that Plaintiffs and class members did not expect.

120.    Excluded from the Rose Stem Cell Class are Defendants, their affiliates, successors and assigns, officers and directors, and members of their immediate families.

121.    This action is properly brought and may be maintained as a class action because it satisfies all of the prerequisites of Rule 23.

122.    Numerosity: Plaintiffs do not know the exact size of the class, but it far exceeds 1,000 persons.

123.    Typicality: Ms. Clair and Ms. Oien's claims against Defendants are typical of the claims of the Rose Stem Cell Class because Ms. Clair, Ms. Oien, and all other members of the class purchased the Rose Stem Cell Products with the same attendant advertising, warranties, and representations. With respect to the class allegations, Ms. Clair and Ms. Oien were subjected to the exact same business practices and representations.

124.    Adequacy: Plaintiffs will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs have no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the class. By prevailing on their claims, Plaintiffs will establish Defendants' liability to all class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

125.    Commonality and Predominance: This action involves common questions the common answers of which will drive the resolution of this case for all class members because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Rose Stem Cell Products were capable of exceptional rejuvenation, regeneration, skin improvement, and healing. The questions of law and

fact common to the members of the Rose Stem Cell Class predominate over any questions affecting only individual members. The questions of law and fact that are common to the Rose Stem Cell Class, including, but not limited to, the following:

- whether Defendants misrepresented or omitted material facts in connection with the promotion, marketing, advertising, packaging, labeling and sale of the Rose Stem Cell Products;

- whether Defendants represented that products in the Rose Stem Cell have characteristics, benefits, uses or qualities that they do not have;

- whether Defendants misled class members by representing that the Rose Stem Cell Products are capable of "Bio-Repair";

- whether Defendants misled class members by representing that the Rose Stem Cell Products contain "reparative" rose stem cells;

- whether Defendants misled class members by representing that the Rose Stem Cell Products contain "cutting-edge plant biotechnology" that "isolates and replicates [rose plant stem cells];"

- whether Defendants misled class members by representing that the Rose Stem Cell Products "regenerate[]" and "rejuvenate[];"

- whether Defendants' nondisclosures and misrepresentations would be material to a reasonable consumer;

- whether the nondisclosures and misrepresentations were likely to deceive a reasonable consumer in violation of state consumer protection statutes;

- whether Defendants were unjustly enriched;

- whether Defendants' unlawful, unfair and/or deceptive practices harmed Ms. Clair,

Ms. Oien, and the members of the Rose Stem Cell Class;

- whether Ms. Clair, Ms. Oien, and the members of the Rose Stem Cell Class are entitled to damages, restitution, and/or equitable or injunctive relief;

- whether Defendants breached their obligations to the Rose Stem Cell Class;

- whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

- the amount of revenues and profits Defendants received and/or the amount of monies or other obligations lost by class members as a result of such wrongdoing;

- whether class members are entitled to injunctive relief and other equitable relief and, if so, what is the nature of such relief; and

- whether class members are entitled to payment of actual, incidental, consequential, exemplary, and/or statutory damages plus interest, and if so, what is the nature of such relief.

126.     Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult

or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

127.    Given the relative size of damages sustained by the individual members of the Rose Stem Cell Class, the diffuse impact of the damages, and homogeneity of the issues, the interests of members of the Rose Stem Cell Class individually controlling the prosecution of separate actions is minimal.

128.    Plaintiffs have demonstrated their commitment to the case, have diligently educated themselves as to the issues involved, and to the best of their knowledge do not have any interests adverse to the proposed classes.

129.    There is no litigation already commenced for these class representatives, nor is there anticipated to be subsequent litigation commenced by other members of the Rose Stem Cell Class concerning Defendants' alleged conduct. Consequently, concerns with respect to the maintenance of a class action regarding the extent and nature of any litigation already commenced by members of the Rose Stem Cell Class are non-existent.

130.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**B.    The Water Drench Class**

131.    Plaintiffs Bonnie McDonald, Angela Clair, and Miley-Isabella Oien seek to represent the " Water Drench Class" of persons, defined as:

> All persons who, between August 27, 2015 and the present, purchased, in Florida, New York, or Washington any Water Drench Product.

132.    Plaintiff Bonnie McDonald also seeks to represent a subclass of those members of the Water Drench Class who purchased any Water Drench Product in Florida (the "Florida Water Drench Subclass").

133.    Plaintiff Angela Clair also seeks to represent a subclass of those members of the Water Drench Class who purchased any Water Drench Product in New York (the "New York Water Drench Subclass").

134.    Plaintiff Miley-Isabella Oien also seeks to represent a subclass of those members of the Water Drench Class who purchased any Water Drench Product in Washington (the "Washington Water Drench Subclass").

135.    Plaintiffs and members of the proposed class have been economically damaged by their purchase of the Product because the advertising for the Product was and is untrue and/or misleading under New York law; therefore, the Product is worth less than what Plaintiffs and members of the Class paid for them and/or Plaintiffs and members of the Class did not receive what they reasonably intended to receive.

136.    As a direct and proximate result of Defendants' unfair and wrongful conduct, as set forth herein, Plaintiffs and the class members: (1) were misled into purchasing the Product; (2) received a product that failed to meet their reasonable expectations and Defendants' promises; (3) paid a premium sum of money for a product that was not as represented and, thus, were deprived of the benefit of the bargain because the purchased product had less value than what was represented by Defendants; and (4) used a product that was other than what was represented by Defendants and that Plaintiffs and class members did not expect.

137.    Excluded from the Water Drench Class are Defendants, their affiliates, successors and assigns, officers and directors, and members of their immediate families.

138.    This action is properly brought and may be maintained as a class action because it satisfies all of the prerequisites of Rule 23.

139.    Numerosity: Plaintiffs do not know the exact size of the class, but it far exceeds 1,000 persons.

140.    Typicality: Ms. McDonald, Ms. Clair, and Ms. Oien's claims against Defendants are typical of the claims of the Water Drench Class because they and all other members of the class purchased the Water Drench Products with the same attendant advertising, warranties, and representations. With respect to the class allegations, Ms. McDonald, Ms. Clair, and Ms. Oien were subjected to the exact same business practices and representations.

141.    Adequacy: Plaintiffs will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs have no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the class. By prevailing on their claims, Plaintiffs will establish Defendants' liability to all class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

142.    Commonality and Predominance: This action involves common questions the common answers of which will drive the resolution of this case for all class members because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Water Drench Products were capable of providing "intense hydration" to the skin by drawing water from the atmosphere . The questions

of law and fact common to the members of the Water Drench Class predominate over any questions affecting only individual members. The questions of law and fact that are common to the Water Drench Class, including, but not limited to, the following:

- whether Defendants misrepresented or omitted material facts in connection with the promotion, marketing, advertising, packaging, labeling and sale of the Water Drench Products;

- whether Defendants represented that products in the Water Drench Products have characteristics, benefits, uses or qualities that they do not have;

- whether Defendants misled class members by representing that the hyaluronic acid in the Water Drench Products "attracts and retains up to 1,000 times its weight in water from moisture in the atmosphere"

- whether Defendants misled class members by representing that the hyaluronic acid in the Water Drench Products "transforms atmospheric vapor into fresh, pure water from the clouds";

- whether Defendants misled class members by representing that the hyaluronic acid in the Water Drench Products provides skin "with a continuous burst of intense hydration that lasts up to 72 hours";

- whether Defendants misled class members by representing that the hyaluronic acid in Defendants' products "draws water vapor from the clouds to help lock in moisture";

- whether Defendants misled class members by representing that the Water Drench Products "transform[] atmospheric vapor into fresh, pure water from the clouds, providing your skin with a continuous burst of intense hydration that lasts up to 72 hours";

- whether Defendants' nondisclosures and misrepresentations would be material to a reasonable consumer;

- whether the nondisclosures and misrepresentations were likely to deceive a reasonable consumer in violation of state consumer protection statutes;

- whether Defendants were unjustly enriched;

- whether Defendants' unlawful, unfair and/or deceptive practices harmed Ms. McDonald, Ms. Clair, Ms. Oien and the members of the Water Drench Class;

- whether Ms. McDonald, Ms. Clair, Ms. Oien, and the members of the Water Drench Class are entitled to damages, restitution, and/or equitable or injunctive relief;

- whether Defendants breached their obligations to the Water Drench Class;

- whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

- the amount of revenues and profits Defendants received and/or the amount of monies or other obligations lost by class members as a result of such wrongdoing;

- whether class members are entitled to injunctive relief and other equitable relief and, if so, what is the nature of such relief; and

- whether class members are entitled to payment of actual, incidental, consequential, exemplary, and/or statutory damages plus interest, and if so, what is the nature of such relief.

143.   Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of class members' rights and the disposition of their interests through actions to

which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

144.    Given the relative size of damages sustained by the individual members of the Water Drench Class, the diffuse impact of the damages, and homogeneity of the issues, the interests of members of the Water Drench Class individually controlling the prosecution of separate actions is minimal.

145.    Plaintiffs have demonstrated their commitment to the case, have diligently educated themselves as to the issues involved, and to the best of their knowledge do not have any interests adverse to the proposed classes.

146.    There is no litigation already commenced for these class representatives, nor is there anticipated to be subsequent litigation commenced by other members of the Water Drench Class concerning Defendants' alleged conduct. Consequently, concerns with respect to the maintenance of a class action regarding the extent and nature of any litigation already commenced by members of the Water Drench Class are non-existent.

147.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## PLAINTIFFS' FIRST CAUSE OF ACTION

**(Common Law Fraud, Deceit and/or Misrepresentation.)**
**On Behalf of Ms. McDonald, Ms. Clair, Ms. Oien, and the Water Drench Class**

148.    Ms. McDonald, Ms. Clair, and Ms. Oien reallege and incorporate by reference all preceding paragraphs of this complaint as if fully set forth herein.

149.    Defendants' representations to Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated on the Website, on product packaging, on social media channels, and through its retailers were false. In particular, the representations were false: (i) that the hyaluronic acid in the Water Drench Products "attracts and retains up to 1,000 times its weight in water from moisture in the atmosphere"; (ii) that the hyaluronic acid in the Water Drench Products "transforms atmospheric vapor into fresh, pure water from the clouds"; (iii) that the hyaluronic acid in the Water Drench Products provides skin "with a continuous burst of intense hydration that lasts up to 72 hours"; (iv) that the hyaluronic acid in Defendants' products "draws water vapor from the clouds to help lock in moisture"; (v) that the Water Drench Products "transform[] atmospheric vapor into fresh, pure water from the clouds, providing your skin with a continuous burst of intense hydration that lasts up to 72 hours"; and (vi) that the Water Drench Products provide "pure, plumping water continuously drawn from the clouds."

150.    Defendants knew that these representations were false when they made them. Defendants run one of the largest cosmetics companies in the world. Accordingly, they chose the ingredients they incorporate in their products, and they are fully aware of the properties and actual capabilities of those ingredients. Defendants are also aware of scientific research (or the lack thereof) regarding those ingredients. Further, Defendants test their products on human skin, and such tests would have revealed the falsity of Defendants' representations.

151.    Defendants further concealed, suppressed, and omitted material facts that would have revealed that the representations regarding hyaluronic acid were false and misleading.

152.    Defendants' misrepresentations and omissions were material at the time they were made. They concerned material facts that were essential to the analysis undertaken by Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated as to whether to purchase the Water Drench Products.

153.    Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated reasonably relied to their detriment on Defendants' representations. Specifically, Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated purchased the Water Drench Products because they believed Defendants' representations regarding hyaluronic acid. In particular, of the representations appearing in Paragraph 149, Ms. McDonald and Ms. Clair relied on (i)-(v); Ms. Oien relied on(i), (iv), and (vi). All understood the representations which they relied to mean that the presence of hyaluronic acid in the Water Drench Products rendered the products they purchased to be capable of drawing large quantities of water from the atmosphere into the user's skin, for long-lasting benefits. This reliance was reasonable because Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated reasonably expected that Defendants would have scientific substantiation for their claims. Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated had no reason to doubt that an established "clinical skin care" company such as Defendants, who sell their products at a premium price alongside other prestige brands, would not use sound science when developing and marketing their products.

154.    Had Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, not purchasing (or paying less for) the Water Drench Products.

155.    Defendants had a duty to inform members of the Water Drench Class at the time of their purchase that the hyaluronic acid in the Water Drench Products: (i) does not "attract[] and retain[] up to 1,000 times its weight in water from moisture in the atmosphere"; (ii) does not "transform[] atmospheric vapor into fresh, pure water from the clouds"; (iii) does not provide skin "with a continuous burst of intense hydration that lasts up to 72 hours"; (iv) does not "draw[] water vapor from the clouds to help lock in moisture"; and (v) does not "transform[] atmospheric vapor into fresh, pure water from the clouds, providing your skin with a continuous burst of intense hydration that lasts up to 72 hours." In making their representations and omissions, Defendants breached their duty to class members. Defendants also gained financially from, and as a result of, their breach.

156.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated to, without limitation, purchase Water Drench Products.

157.    As a direct and proximate result of Defendants' misrepresentations and omissions, Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated have suffered damages. In particular, Ms. McDonald, Ms. Clair, and Ms. Oiens eek to recover on behalf of themselves and those similarly situated the amount of the price premium they paid (i.e., the difference between the price consumers paid for the Water Drench Products and the price they would have paid but for Defendants' misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis, but which is in excess of the jurisdictional minimum of this Court.

158.    Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated.

## PLAINTIFFS' SECOND CAUSE OF ACTION

### (Common Law Fraud, Deceit and/or Misrepresentation)
### On Behalf of Ms. Clair, Ms. Oien, and the Rose Stem Cell Class

159.    Ms. Clair and Ms. Oien reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

160.    Defendants' representations to Ms. Clair, Ms. Oien, and those similarly situated on the Website, on product packaging, on social media channels, and through its retailers were false. In particular, these representations were false: (i) that the Rose Stem Cell Products are capable of "Bio-Repair"; (ii) that the Rose Stem Cell Products contain "reparative" rose stem cells; (iii) that the Rose Stem Cell Products contain "cutting-edge plant biotechnology [that] isolates and replicates [rose plant stem cells]"; (iv) that the Rose Stem Cell Products "help[] reduce the look of fine lines & wrinkles"; (iv) that the Rose Stem Cell Products "regenerate[] and "rejuvenate[]"; and (v) that the Rose Stem Cell Products "stimulate cellular turnover for younger looking skin."

161.    Defendants knew that these representations were false when they made them. Defendants run one of the largest cosmetics companies in the world. Accordingly, they chose the ingredients they incorporate in their products, and they are fully aware of the properties and actual capabilities of those ingredients. Defendants are also aware of scientific research (or the lack thereof) regarding those ingredients. Further, Defendants test their products on human skin, and such tests would have revealed the falsity of Defendants' representations.

162.    Defendants further concealed, suppressed, and omitted material facts that would have revealed that the representations regarding rose stem cells were false and misleading. In particular, Defendants failed to inform Ms. Clair, Ms. Oien, and those similarly situated that any rose stem cells in their products would be dead on arrival at a retailer's store or a consumer's home.

163.    Defendants' misrepresentations and omissions were material at the time they were made. They concerned material facts that were essential to the analysis undertaken by Ms. Clair, Ms. Oien, and those similarly situated as to whether to purchase the Rose Stem Cell Products.

164.    Ms. Clair, Ms. Oien, and those similarly situated reasonably relied to their detriment on Defendants' representations. Specifically, Ms. Clair, Ms. Oien, and those similarly situated purchased the Rose Stem Cell Products because they believed Defendants' representations regarding rose stem cells. This reliance was reasonable because Ms. Clair, Ms. Oien, and those similarly situated reasonably expected that Defendants would have scientific substantiation for their claims. Ms. Clair, Ms. Oien, and those similarly situated had no reason to doubt that established "clinical skin care" company such as Defendants would not use sound science when developing and marketing their products.

165.    Had Ms. Clair, Ms. Oien, and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, not purchasing (or paying less for) the Rose Stem Cell Products.

166.    Defendants had a duty to inform members of the Rose Stem Cell Class at the time of their purchase that: (i) the Rose Stem Cell Products are incapable of "Bio-Repair"; (ii) the Rose Stem Cell Products do not contain "reparative" rose stem cells; (iii) the Rose Stem Cell Products do not contain "cutting-edge plant biotechnology [that] isolates and replicates [rose

plant stem cells]"; (iv) the Rose Stem Cell Products "do not help[] reduce the look of fine lines & wrinkles"; (iv) the Rose Stem Cell Products do not "regenerate[]" and "rejuvenate[]"; and (v) the Rose Stem Cell Products do not "stimulate cellular turnover for younger looking skin." In making their representations and omissions, Defendants breached their duty to class members. Defendants also gained financially from, and as a result of, their breach.

167.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Ms. Clair, Ms. Oien, and those similarly situated to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced Ms. Clair, Ms. Oien, and those similarly situated to, without limitation, purchase Rose Stem Cell Products.

168.    As a direct and proximate result of Defendants' misrepresentations and omissions, Ms. Clair, Ms. Oien, and those similarly situated have suffered damages. In particular, Ms. Clair and Ms. Oienseek to recover on behalf of themselves and those similarly situated the amount of the price premium they paid (i.e., the difference between the price consumers paid for the Rose Stem Cell Products and the price they would have paid but for Defendants' misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis, but which is in excess of the jurisdictional minimum of this Court.

169.    Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to Ms. Clair, Ms. Oien, and those similarly situated.

## PLAINTIFFS' THIRD CAUSE OF ACTION

### (Negligent Misrepresentation)
### On Behalf of Ms. McDonald, Ms. Clair, Ms. Oien, and the Water Drench Class

170.    Ms. McDonald, Ms. Clair and Ms. Oien reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

171.    In marketing and selling the Water Drench Products to consumers, Defendants made the following false and misleading statements: (i) that the hyaluronic acid in the Water Drench Products "attracts and retains up to 1,000 times its weight in water from moisture in the atmosphere"; (ii) that the hyaluronic acid in the Water Drench Products "transforms atmospheric vapor into fresh, pure water from the clouds"; (iii) that the hyaluronic acid in the Water Drench Products provides skin "with a continuous burst of intense hydration that lasts up to 72 hours"; (iv) that the hyaluronic acid in Defendants' products "draws water vapor from the clouds to help lock in moisture"; (v) that the Water Drench Products "transform[] atmospheric vapor into fresh, pure water from the clouds, providing your skin with a continuous burst of intense hydration that lasts up to 72 hours"; and (vi) that the Water Drench Products provide "pure, plumping water continuously drawn from the clouds." Defendants, however, deceptively failed to inform consumers that all of these statements are false. Defendants also deceptively failed to inform consumers that the hyaluronic acid in the Water Drench Products is already saturated by the time it is applied to the a user's skin, and that to the extent it is even capable of absorbing moisture, it would absorb moisture from the user's skin, not from the atmosphere.

172.    These representations were material at the time they were made. They concerned material facts that were essential to the decision of Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated regarding how much to pay for the Water Drench Products.

173.    Defendants made identical misrepresentations and omissions to members of the Water Drench Class regarding the Water Drench Products.

174.    Defendants should have known their representations were false, and had no reasonable grounds for believing them to be true when they were made. Defendants run one of the largest cosmetics companies in the world. Accordingly, they chose the ingredients they incorporate in their products, and they are fully aware of the properties and actual capabilities of those ingredients. Defendants are also aware of scientific research (or the lack thereof) regarding those ingredients. Further, Defendants test their products on human skin, and such tests would have revealed the falsity of Defendants' representations.

175.    By and through such negligent misrepresentations, Defendants intended to induce Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated to alter their position to their detriment. Specifically, Defendants negligently induced Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated, without limitation, to purchase the Water Drench Products at the price they paid.

176.    Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated reasonably relied on Defendants' representations. Specifically, Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated reasonably relied to their detriment on Defendants' representations. Specifically, Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated purchased the Water Drench Products because they believed Defendants' representations regarding hyaluronic acid. In particular, of the representations appearing in Paragraph 171, Ms. McDonald and Ms. Clair relied on (i)-(v); Ms. Oien relied on (i), (iv), and (vi). All understood the representations which they relied to mean that the presence of hyaluronic acid in the Water Drench Products rendered the products they purchased to be capable of drawing large quantities of water from the

atmosphere into the user's skin, for long-lasting benefits. This reliance was reasonable because Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated reasonably expected that Defendants would make truthful representations, because of the brand's positioning as a "clinical skin care" company in the prestige market and the high price commanded for the products. In particular. Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated had no reason to doubt that an established "clinical skin care" company such as Defendants would not use sound science when developing and marketing their products.

177.    Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated paid as much as they did for Water Drench Products because of the false and misleading representations described herein.

178.    Because they reasonably relied on Defendants' false representations, Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated were harmed in the amount of the price premium they paid (i.e., the difference between the price consumers paid for Water Drench Products and the price they would have paid but for Defendants' misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis, but which is in excess of the jurisdictional minimum of this court.

## PLAINTIFFS' FOURTH CAUSE OF ACTION

### (Negligent Misrepresentation)
### On Behalf of Ms. Clair, Ms. Oien, and the Rose Stem Cell Class

179.    Ms. Clair and Ms. Oien reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

180.    In marketing and selling the Rose Stem Cell Products to consumers, Defendants made the following false and misleading statements: (i) that the Rose Stem Cell Products are

capable of "Bio-Repair"; (ii) that the Rose Stem Cell Products contain "reparative" rose stem cells; (iii) that the Rose Stem Cell Products contain "cutting-edge plant biotechnology [that] isolates and replicates [rose plant stem cells]"; (iv) that the Rose Stem Cell Products "help[] reduce the look of fine lines & wrinkles"; (iv) that the Rose Stem Cell Products "regenerate[] and "rejuvenate[]"; and (v) that the Rose Stem Cell Products "stimulate cellular turnover for younger looking skin." Defendants deceptively failed to inform consumers that all of these statements are false. Defendants also deceptively failed to inform consumers that the rose stem cells in their products would be dead on arrival at a retailer's store or a consumer's home.

181.    These representations were material at the time they were made. They concerned material facts that were essential to the decision of Ms. Clair, Ms. Oien, and those similarly situated regarding how much to pay for the Rose Stem Cell Products.

182.    Defendants made identical misrepresentations and omissions to members of the Rose Stem Cell Class regarding the Rose Stem Cell Products.

183.    Defendants should have known their representations were false, and had no reasonable grounds for believing them to be true when they were made. Defendants run one of the largest cosmetics companies in the world. Accordingly, they chose the ingredients they incorporate in their products, and they are fully aware of the properties and actual capabilities of those ingredients. Defendants are also aware of scientific research (or the lack thereof) regarding those ingredients. Further, Defendants test their products on human skin, and such tests would have revealed the falsity of Defendants' representations.

184.    By and through such negligent misrepresentations, Defendants intended to induce Ms. Clair, Ms. Oien, and those similarly situated to alter their position to their detriment.

Specifically, Defendants negligently induced Ms. Clair, Ms. Oien, and those similarly situated, without limitation, to purchase the Rose Stem Cell Products at the price they paid.

185.    Ms. Clair, Ms. Oien, and those similarly situated reasonably relied on Defendants' representations. Specifically, Ms. Clair, Ms. Oien, and those similarly situated paid as much as they did for Rose Stem Cell Products because of the false and misleading representations described herein.

186.    Because they reasonably relied on Defendants' false representations, Ms. Clair, Ms. Oien, and those similarly situated were harmed in the amount of the price premium they paid (i.e., the difference between the price consumers paid for Rose Stem Cell Products and the price they would have paid but for Defendants' misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis.

## PLAINTIFFS' FIFTH CAUSE OF ACTION

### (Quasi-Contract Claim for Restitution (Unjust Enrichment))
### On Behalf of Ms. McDonald, Ms. Clair, Ms. Oien, and the Water Drench Class

187.    Ms. McDonald, Ms. Clair, and Ms. Oien reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

188.    Ms. McDonald, Ms. Clair, Ms. Oien, and the Water Drench Class members conferred a benefit on the Defendants by purchasing Water Drench Products.

189.    Defendants have been unjustly enriched in retaining the revenues from these purchases of Water Drench Products. Retention of those revenues is unjust and inequitable because Defendants falsely represented: (i) that the hyaluronic acid in the Water Drench Products "attracts and retains up to 1,000 times its weight in water from moisture in the atmosphere"; (ii) that the hyaluronic acid in the Water Drench Products "transforms atmospheric vapor into fresh, pure water from the clouds"; (iii) that the hyaluronic acid in the Water Drench

Products provides skin "with a continuous burst of intense hydration that lasts up to 72 hours"; (iv) that the hyaluronic acid in Defendants' products "draws water vapor from the clouds to help lock in moisture"; and (v) that the Water Drench Products "transform[] atmospheric vapor into fresh, pure water from the clouds, providing your skin with a continuous burst of intense hydration that lasts up to 72 hours"; and (vi) that the Water Drench Products provide "pure, plumping water continuously drawn from the clouds."

190.     These representations caused injuries to Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated because they paid a price premium due to the misleading labeling and advertising connected to the Water Drench Products. Specifically, Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated purchased the Water Drench Products because they believed Defendants' representations regarding hyaluronic acid. In particular, of the representations appearing in Paragraph 189, Ms. McDonald and Ms. Clair relied on (i)-(v); Ms. Oien relied on (i), (iv), and (vi). All understood the representations which they relied to mean that the presence of hyaluronic acid in the Water Drench Products rendered the products they purchased to be capable of drawing large quantities of water from the atmosphere into the user's skin, for long-lasting benefits. This reliance was reasonable because Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated reasonably expected that Defendants would make truthful representations, because of the brand's positioning as a "clinical skin care" company in the prestige market and the high price commanded for the products. In particular. Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated had no reason to doubt that an established "clinical skin care" company such as Defendants would not use sound science when developing and marketing their products.

191.    Because Defendants' retention of the non-gratuitous benefit conferred on them by Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated is unjust and inequitable, Defendants must pay restitution to Ms. McDonald, Ms. Clair, Ms. Oien, and the Water Drench Class members for their unjust enrichment, as ordered by the Court.

192.    To the extent required under the laws of New York, Florida, and/or Washington, this cause of action is alleged only as an alternative theory of recovery.

193.    Ms. McDonald, Ms. Clair, and Ms. Oien, therefore, seek an order requiring Defendants to make restitution to themselves and other members of the Water Drench Class .

## PLAINTIFFS' SIXTH CAUSE OF ACTION

### (Unjust Enrichment)
### On Behalf of Ms. Clair, Ms. Oien, and the Rose Stem Cell Class

194.    Ms. Clair and Ms. Oien reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

195.    Ms. Clair, Ms. Oien, and the Rose Stem Cell Class members conferred a benefit on the Defendants by purchasing Rose Stem Cell Products.

196.    Defendants have been unjustly enriched in retaining the revenues from these purchases of Rose Stem Cell Products. Retention of those revenues is unjust and inequitable because Defendants falsely represented: (i) that the Rose Stem Cell Products are capable of "Bio-Repair"; (ii) that the Rose Stem Cell Products contain "reparative" rose stem cells; (iii) that the Rose Stem Cell Products contain "cutting-edge plant biotechnology [that] isolates and replicates [rose plant stem cells]"; (iv) that the Rose Stem Cell Products "help[] reduce the look of fine lines & wrinkles"; (iv) that the Rose Stem Cell Products "regenerate[]" and "rejuvenate[]"; and (v) that the Rose Stem Cell Products "stimulate cellular turnover for younger looking skin." These representations caused injuries to Ms. Clair, Ms. Oien, and those similarly situated

because they paid a price premium due to the misleading labeling and advertising connected to the Rose Stem Cell Products.

197.    Because Defendants' retention of the non-gratuitous benefit conferred on them by Ms. Clair, Ms. Oien, and those similarly situated is unjust and inequitable, Defendants must pay restitution to Ms. Clair, Ms. Oien, and the Rose Stem Cell Class members for their unjust enrichment, as ordered by the Court.

198.    To the extent required under the laws of New York, Florida, and/or Washington, this cause of action is alleged only as an alternative theory of recovery.

199.    Ms. Clair and Ms. Oien, therefore, seek an order requiring Defendants to make restitution to themselves and other members of the Rose Stem Cell Class.

<u>**PLAINTIFFS' SEVENTH CAUSE OF ACTION**</u>

**(Breach of Express Warranty)**
**On Behalf of Ms. McDonald, Ms. Clair, Ms. Oien, and the Water Drench Class**

200.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

201.    Under state law, any affirmation of fact or promise made by the seller or manufacturer to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

202.    Under state law, any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

203.    Defendants represented: (i) that the hyaluronic acid in the Water Drench Products "attracts and retains up to 1,000 times its weight in water from moisture in the atmosphere"; (ii) that the hyaluronic acid in the Water Drench Products "transforms atmospheric vapor into fresh, pure water from the clouds"; (iii) that the hyaluronic acid in the Water Drench Products provides

skin "with a continuous burst of intense hydration that lasts up to 72 hours"; (iv) that the

hyaluronic acid in Defendants' products "draws water vapor from the clouds to help lock in

moisture"; (v) that the Water Drench Products "transform[] atmospheric vapor into fresh, pure

water from the clouds, providing your skin with a continuous burst of intense hydration that lasts

up to 72 hours"; and (vi) that the Water Drench Products provide "pure, plumping water

continuously drawn from the clouds." These representations became part of the basis of the

bargain to purchase the Products, creating an express warranty. In the alternative, the

representations describe the goods and formed the basis of the bargain to purchase the Water

Drench Products, thereby creating an express warranty that the Water Drench Products would

conform to these descriptions.

204.    Plaintiffs and class members reasonably and justifiably relied on the foregoing

express warranties, believing that the Water Drench Products did in fact conform to the

warranties. Specifically, Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated

purchased the Water Drench Products because they believed Defendants' representations

regarding hyaluronic acid. In particular, of the representations appearing in Paragraph 203, Ms.

McDonald and Ms. Clair relied on (i)-(v); Ms. Oien relied on (i), (iv), and (vi). All understood

the representations which they relied to mean that the presence of hyaluronic acid in the Water

Drench Products rendered the products they purchased to be capable of drawing large quantities

of water from the atmosphere into the user's skin, for long-lasting benefits. This reliance was

reasonable because Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated reasonably

expected that Defendants would make truthful representations, because of the brand's

positioning as a "clinical skin care" company in the prestige market and the high price

commanded for the products. In particular. Ms. McDonald, Ms. Clair, Ms. Oien, and those

similarly situated had no reason to doubt that an established "clinical skin care" company such as Defendants would not use sound science when developing and marketing their products.

205.    Defendants breached these express warranties because the representations made about the Water Drench Products are false. Defendants knew that their express promises were false, but intentionally misled consumers anyway. Defendants have, as a result, breached their express warranties.

206.    Defendants' breach of its express warranties damaged Plaintiffs and those similarly situated. Were it not for Defendants' false affirmations, promises, and descriptions of the Water Drench Product, Plaintiffs and those similarly situated would have acted differently by, without limitation, not purchasing (or paying less for) the Water Drench Products. Defendants damaged Plaintiffs and members of the class in an amount to be determined at trial.

## PLAINTIFFS' EIGHTH CAUSE OF ACTION

### (Breach of Express Warranty)
### On Behalf of Ms. Clair, Ms. Oien, and the Rose Stem Cell Class

207.    Ms. Clair and Ms. Oien reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

208.    Under state law, any affirmation of fact or promise made by the seller or manufacturer to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

209.    Under state law, any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

210.    Defendants' represented: (i) that the Rose Stem Cell Products are capable of "Bio-Repair"; (ii) that the Rose Stem Cell Products contain "reparative" rose stem cells; (iii) that the Rose Stem Cell Products contain "cutting-edge plant biotechnology [that] isolates and replicates

[rose plant stem cells]"; (iv) that the Rose Stem Cell Products "help[] reduce the look of fine lines & wrinkles"; (iv) that the Rose Stem Cell Products "regenerate[]" and "rejuvenate[]"; and (v) that the Rose Stem Cell Products "stimulate cellular turnover for younger looking skin." These representations became part of the basis of the bargain to purchase the Rose Stem Cell Products, creating an express warranty. In the alternative, the representations describe the goods and were made as part of the basis of the bargain to purchase the Rose Stem Cell Products, thereby creating an express warranty that the Products would conform to these descriptions.

211.    Ms. Clair, Ms. Oien, and class members reasonably and justifiably relied on the foregoing express warranties, believing that the Rose Stem Cell Products did in fact conform to the warranties.

212.    Defendants breached these express warranties because the representations made about the Rose Stem Cell Products are false. Defendants knew that their express promises were false, but intentionally misled consumers anyway. Defendants have, as a result, breached their express warranties.

213.    Defendants' breach of their express warranties damaged Ms. Clair, Ms. Oien, and those similarly situated. Were it not for Defendants' false affirmations, promises, and descriptions of the Rose Stem Cell Products, Plaintiffs and those similarly situated would have acted differently by, without limitation, not purchasing (or paying less for) the Rose Stem Cell Products. Defendants damaged Plaintiffs and members of the class in an amount to be determined at trial.

## PLAINTIFF'S NINTH CAUSE OF ACTION

**(Breach of Implied Warranty)**
**On Behalf of Ms. McDonald, Ms. Clair, Ms. Oien, and the Water Drench Class**

214.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

215.    Under state law, a warranty that goods are merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. The warranty of merchantability extends to the end user (i.e., the consumer) of the products.

216.    As manufacturers and retailers of the Water Drench Products, Defendants are merchants. Under the law a warranty of merchantability is implied in every contract for the sale of the Water Drench Products, including the sales to Plaintiffs and class members.

217.    Under state law, merchantable goods must be adequately contained, packaged, and labeled as the agreement may require; and must also conform to the promises or affirmations of fact made on the container or label. *See e.g.* Fla. Stat. Ann. § 672.314(2)(e); *see also* N.Y. U.C.C. §§ 2-314 & 2-315.

218.    The Water Drench Products were not adequately contained, packaged, or labeled as required for its sale to Plaintiffs and those similarly situated required. In particular, Defendants made the following representations about the Water Drench Products: (i) that the hyaluronic acid in the Water Drench Products "attracts and retains up to 1,000 times its weight in water from moisture in the atmosphere"; (ii) that the hyaluronic acid in the Water Drench Products "transforms atmospheric vapor into fresh, pure water from the clouds"; (iii) that the hyaluronic acid in the Water Drench Products provides skin "with a continuous burst of intense hydration that lasts up to 72 hours"; (iv) that the hyaluronic acid in Defendants' products "draws water vapor from the clouds to help lock in moisture"; (v) that the Water Drench Products

"transform[] atmospheric vapor into fresh, pure water from the clouds, providing your skin with a continuous burst of intense hydration that lasts up to 72 hours"; and (vi) that the Water Drench Products provide "pure, plumping water continuously drawn from the clouds."

219.    Defendants' representations on the Water Drench Products and on the Website are promises or affirmations of fact to Plaintiffs and class members.

220.    However, the Water Drench Products do not conform to Defendants' promises and affirmations of fact as explained in paragraphs 53 through 62 of the Class Action Complaint. Amongst other things, the Water Drench Products do not "draw[] water vapor from the clouds to help lock in moisture" and hyaluronic acid is not capable of absorbing 1,000 times its weight in water.

221.    Defendants knowingly and intentionally breached their implied warranty of merchantability for the Water Drench Products.

222.    Had Plaintiffs and class members known that the Water Drench Products do not conform to Defendants' representations, they would not have purchased them or would have, at minimum, paid less for the product. Specifically, Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated purchased the Water Drench Products because they believed Defendants' representations regarding hyaluronic acid. In particular, of the representations appearing in Paragraph 218, Ms. McDonald and Ms. Clair relied on (i)-(v); Ms. Oien relied on (i), (iv), and (vi). All understood the representations which they relied to mean that the presence of hyaluronic acid in the Water Drench Products rendered the products they purchased to be capable of drawing large quantities of water from the atmosphere into the user's skin, for long-lasting benefits. This reliance was reasonable because Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated reasonably expected that Defendants would make truthful representations,

because of the brand's positioning as a "clinical skin care" company in the prestige market and the high price commanded for the products. In particular. Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated had no reason to doubt that an established "clinical skin care" company such as Defendants would not use sound science when developing and marketing their products.

223.    As a direct and proximate result of Defendants' breach of warranty, Plaintiffs and members of the class have been injured in an amount to be determined at trial.

## PLAINTIFF'S TENTH CAUSE OF ACTION

### (Breach of Implied Warranty)
### On Behalf of Ms. Clair, Ms. Oien, and the Rose Stem Cell Class

224.    Ms. Clair and Ms. Oien reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

225.    Under state law, a warranty that goods are merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. The warranty of merchantability extends to the end user (i.e., the consumer) of the products.

226.    As manufacturers and retailers of the Rose Stem Cell Products, Defendants are merchants. Under the law a warranty of merchantability is implied in every contract for the sale of the Rose Stem Cell Products, including the sales to Plaintiffs and class members.

227.    Under state law, merchantable goods must be adequately contained, packaged, and labeled as the agreement may require; and must also conform to the promises or affirmations of fact made on the container or label. *See e.g.* Fla. Stat. Ann. § 672.314(2)(e); *see also* N.Y. U.C.C. §§ 2-314 & 2-315.

228.    The Rose Stem Cell Products were not adequately contained, packaged, or labeled as required for its sale to Plaintiffs and those similarly situated required. In particular,

Defendants made the following representations about the Rose Stem Cell Products: (i) that the Rose Stem Cell Products are capable of "Bio-Repair"; (ii) that the Rose Stem Cell Products contain "reparative" rose stem cells; (iii) that the Rose Stem Cell Products contain "cutting-edge plant biotechnology [that] isolates and replicates [rose plant stem cells]"; (iv) that the Rose Stem Cell Products "help[] reduce the look of fine lines & wrinkles"; (iv) that the Rose Stem Cell Products "regenerate[]" and "rejuvenate[]"; and (v) that the Rose Stem Cell Products "stimulate cellular turnover for younger looking skin." These representations became part of the basis of the bargain to purchase the Rose Stem Cell Products, creating an express warranty. In the alternative, the representations describe the goods and were made as part of the basis of the bargain to purchase the Rose Stem Cell Products, thereby creating an express warranty that the Products would conform to these descriptions.

229.    Defendants' representations on the Rose Stem Cell Products and on the Website are promises or affirmations of fact to Ms. Clair, Ms. Oien, and class members.

230.    However, the Rose Stem Cell Products do not conform to Defendants' promises and affirmations of fact as explained in paragraphs 30 through 39 of the Class Action Complaint. Amongst other things, rose stem cells provide no therapeutic benefit to humans, they do not "regenerate," "repair" or "rejuvenate" skin, they do not "bio-repair." Even if they were capable of doing so the rose stem cells in Defendants' Rose Stem Cell Products were dead by the time they reached consumers.

231.    Defendants knowingly and intentionally breached their implied warranty of merchantability for the Rose Stem Cell Products.

232.    Had Ms. Clair, Ms. Oien, and class members known that the Rose Stem Cell Products do not conform to Defendants' representations, they would not have purchased them or

would have, at minimum, paid less for the product. As a direct and proximate result of Defendants' breach of warranty, Ms. Clair, Ms. Oien, and members of the class have been injured in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

**(Violation of Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.*)**
**On Behalf of Ms. Clair, Ms. Oien, and the Rose Stem Cell Class**

233.    Ms. Clair and Ms. Oien reallege and incorporate each and every allegation set forth above as if fully written herein.

234.    This Court has jurisdiction to decide claims brought under the MMWA by virtue of 15 U.S.C. § 2310(d) and 28 U.S.C. § 1332(d).

235.    Ms. Clair, Ms. Oien, and members of the Class are "consumers" within the meaning of 15 U.S.C. § 2301(3).

236.    Each Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5), respectively.

237.    The Rose Stem Cell Products are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

238.    Defendants have not established a procedure by which consumers can informally resolve their disputes, and accordingly, Ms. Clair and Ms. Oien have complied with the notice requirements of 15 U.S.C. § 2310(a).

239.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

240.    As this action is brought as a class action with fewer than 100 named plaintiffs, and the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and

costs) on the basis of all claims to be determined in this lawsuit, Ms. Clair and Ms. Oien meet the requirements of 15 U.S.C. § 2310(d)(3).

241.    Defendants provided Ms. Clair, Ms. Oien, and each member of the Class with "written warranties" and "implied warranties," identified herein, which are covered under 15 U.S.C. § 2301(6) and (7), respectively.

242.    Defendants' written warranty includes written affirmations of fact made in connection with the sale of Rose Stem Cell Products on its website, print advertising, marketing materials, and on its packaging materials. In particular, Defendants made the following written affirmations of fact about the Rose Stem Cell Products: (i) that the Rose Stem Cell Products are capable of "Bio-Repair"; (ii) that the Rose Stem Cell Products contain "reparative" rose stem cells; (iii) that the Rose Stem Cell Products contain "cutting-edge plant biotechnology [that] isolates and replicates [rose plant stem cells]"; (iv) that the Rose Stem Cell Products "help[] reduce the look of fine lines & wrinkles"; (iv) that the Rose Stem Cell Products "regenerate[]" and "rejuvenate[]"; and (v) that the Rose Stem Cell Products "stimulate cellular turnover for younger looking skin." As described herein, these statements are false and significantly misrepresent the characteristics of the product.

243.    Defendant's implied warranties include affirmations that the Rose Stem Cell Products are capable of improving, repairing, and restoring the skin.

244.    The terms of these warranties became part of the basis of the bargain when Ms. Clair, Ms. Oien, and each member of the Class purchased their Products.

245.    Defendant breached these written and implied warranties as described in detail herein. Without limitation, the Rose Stem Cell Products share common defects in that they are not capable of repairing or improving the skin.

246.    Ms. Clair, Ms. Oien, and each member of the Class have had sufficient direct dealings with either Defendants or its agents (including directly online and through retailers) to establish privity of contract between Defendants, on the one hand, and Ms. Clair, Ms. Oien, and each member of the Class, on the other hand. Nonetheless, privity is not required here because Ms. Clair, Ms. Oien, and each member of the Class are intended third-party beneficiaries of contracts between Defendants and its retailers, and specifically, of Defendants' implied warranties. The retailers were not intended to be the ultimate consumers of the Rose Stem Cell Products and have no rights under the warranties provided with the Rose Stem Cell Products; the warranty agreements were designed for and intended to benefit consumers only.

247.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or each Product, Defendants knew, or should have known, of its misrepresentations and/or material omissions concerning the Rose Stem Cell Products inability to function as warranted, but nonetheless failed to rectify the situation and/or disclose the defects. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Ms. Clair, Ms. Oien, or members of the Class resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

248.    In addition, given the conduct described herein, any attempts by Defendants, in its capacity as a warrantor, to limit the implied warranties in a manner that would exclude coverage of the defects in the Rose Stem Cell Products is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defects is null and void.

249.    As a direct and proximate result of Defendants' breach of the written and implied warranties, Ms. Clair, Ms. Oien, and each member of the Class have suffered damages.

250.    Ms. Clair and Ms. Oien, individually and on behalf of the Class, seek all damages permitted by law, including compensation for the cost of purchasing the Rose Stem Cell Products, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

## TWELFTH CAUSE OF ACTION

**(Violation of Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*)**
**On Behalf of Ms. McDonald, Ms. Clair, Ms. Oien, and the Water Drench Class**

251.    Plaintiffs reallege and incorporate each and every allegation set forth above as if fully written herein.

252.    This Court has jurisdiction to decide claims brought under the MMWA by virtue of 15 U.S.C. § 2310(d) and 28 U.S.C. § 1332(d).

253.    Plaintiffs and members of the Class are "consumers" within the meaning of 15 U.S.C. § 2301(3).

254.    Each Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5), respectively.

255.    The Water Drench Products are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

256.    Defendants have not established a procedure by which consumers can informally resolve their disputes, and accordingly, Plaintiffs have complied with the notice requirements of 15 U.S.C. § 2310(a).

257.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

258.    As this action is brought as a class action with fewer than 100 named plaintiffs, and the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this lawsuit, Plaintiffs meet the requirements of 15 U.S.C. § 2310(d)(3).

259.    Defendants provided Plaintiffs and each member of the Class with "written warranties" and "implied warranties," identified herein, which are covered under 15 U.S.C. § 2301(6) and (7), respectively.

260.    Defendants' written warranty includes written affirmations of fact made in connection with the sale of Water Drench Products on its website, print advertising, marketing materials, and on its packaging materials that state (i) that the hyaluronic acid in the Water Drench Products "attracts and retains up to 1,000 times its weight in water from moisture in the atmosphere"; (ii) that the hyaluronic acid in the Water Drench Products "transforms atmospheric vapor into fresh, pure water from the clouds"; (iii) that the hyaluronic acid in the Water Drench Products provides skin "with a continuous burst of intense hydration that lasts up to 72 hours"; (iv) that the hyaluronic acid in Defendants' products "draws water vapor from the clouds to help lock in moisture"; (v) that the Water Drench Products "transform[] atmospheric vapor into fresh, pure water from the clouds, providing your skin with a continuous burst of intense hydration that lasts up to 72 hours"; and (vi) that the Water Drench Products provide "pure, plumping water continuously drawn from the clouds." As described herein, these statements are false and significantly misrepresent the characteristics of the products.

261.    Defendant's implied warranties include affirmations that the Water Drench Products are capable of providing exceptional moisture to the skin.

262.    The terms of these warranties became part of the basis of the bargain when Plaintiffs and each member of the Class purchased their Products. Specifically, Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated purchased the Water Drench Products because they believed Defendants' representations regarding hyaluronic acid. In particular, of the representations appearing in Paragraph 260, Ms. McDonald and Ms. Clair relied on (i)-(v); Ms. Oien relied on(i), (iv), and (vi). All understood the representations which they relied to mean that the presence of hyaluronic acid in the Water Drench Products rendered the products they purchased to be capable of drawing large quantities of water from the atmosphere into the user's skin, for long-lasting benefits. This reliance was reasonable because Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated reasonably expected that Defendants would make truthful representations, because of the brand's positioning as a "clinical skin care" company in the prestige market and the high price commanded for the products. In particular. Ms. McDonald, Ms. Clair, Ms. Oien, and those similarly situated had no reason to doubt that an established "clinical skin care" company such as Defendants would not use sound science when developing and marketing their products.

263.    Defendant breached these written and implied warranties as described in detail herein. Without limitation, the Water Drench Products share common defects in that they are not capable of hydrating the skin to the extent suggested by such warranties..

264.    Plaintiffs and each member of the Class have had sufficient direct dealings with either Defendants or its agents (including directly online and through retailers) to establish privity of contract between Defendants, on the one hand, and Plaintiffs and each member of the Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each member of the Class are intended third-party beneficiaries of contracts between Defendants and

its retailers, and specifically, of Defendants' implied warranties. The retailers were not intended to be the ultimate consumers of the Water Drench Products and have no rights under the warranties provided with the Water Drench Products; the warranty agreements were designed for and intended to benefit consumers only.

265.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or each Product, Defendants knew, or should have known, of its misrepresentations and/or material omissions concerning the Water Drench Products inability to function as warranted, but nonetheless failed to rectify the situation and/or disclose the defects. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs or members of the Class resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

266.    In addition, given the conduct described herein, any attempts by Defendants, in its capacity as a warrantor, to limit the implied warranties in a manner that would exclude coverage of the defects in the Water Drench Products is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defects is null and void.

267.    As a direct and proximate result of Defendants' breach of the written and implied warranties, Plaintiffs and each member of the Class have suffered damages.

268.    Plaintiffs, individually and on behalf of the Class, seek all damages permitted by law, including compensation for the cost of purchasing the Water Drench Products, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

## PLAINTIFFS' THIRTEENTH CAUSE OF ACTION

**(Violation of the Consumer Protection Acts of Consumer Protection Statutes (New York General Business Law ("NYGBL") §§ 349 & 350, Florida Statutes ("Florida Deceptive and Unfair Trade Practices Act") § 501.201 et seq., and Washington Revised Code § 19.86.010 et seq (Unfair Business Practices – Consumer Protection))**

**On Behalf of Ms. Clair, Ms. Oien, and the Rose Stem Cell Class**

269.    Plaintiffs reallege and incorporate the above paragraphs of this Complaint as if fully set forth herein.

270.    Plaintiffs bring these claims on behalf of the Classes for violation of the consumer protection acts of Florida, New York, and Washington.

271.    Plaintiffs bring these statutory consumer protection claims pursuant to the substantially similar "Consumer Protection Acts" identified below, all of which were enacted and designed to protect consumers against unlawful, fraudulent, and/or unfair business acts and practices.

272.    The following consumer protection acts are collectively referred to herein as the "Consumer Protection Acts":

a.    FLA. STAT. ANN. § 501.201 et seq. (Florida);

b.    N.Y. GEN. BUS. LAW. § 349 et seq. (New York);

c.    N.Y. GEN. BUS. LAW § 350 et seq. (New York);

d.    WASH. REV. CODE ANN. § 19.86.010 et seq. (Washing-ton);

273.    Plaintiffs and members of the Classes have standing to assert claims under the Consumer Protection Acts because they are consumers within the meaning of the Consumer Protection Acts and Defendants' practices were addressed to the market generally and otherwise implicate consumer protection concerns.

274.    Defendants have engaged in and continue to engage in the unfair, unlawful and deceptive trade practices outlined in this Class Action Complaint.

275.    Within four years preceding the filing of this Class Action Complaint, and at all times mentioned herein, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices throughout the nation by carrying out the unfair, deceptive and unlawful business practices outlined in this Class Action Complaint.

276.    With respect to the marketing of the Rose Stem Cell Products, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices by, without limitation, the following:

    a.   falsely representing to Ms. Clair, Ms. Oien, and those similarly situated that the Rose Stem Cell Products are capable of "Bio-Repair";

    b.   falsely representing to Ms. Clair, Ms. Oien, and those similarly situated that the Rose Stem Cell Products contain "reparative" rose stem cells;

    c.   falsely representing to Ms. Clair, Ms. Oien, and those similarly situated the Rose Stem Cell Products contain "cutting-edge plant biotechnology [that] isolates and replicates [rose plant stem cells]";

    d.   falsely representing to Ms. Clair, Ms. Oien, and those similarly situated that the Rose Stem Cell Products "help[] reduce the look of fine lines & wrinkles";

    e.   falsely representing to Ms. Clair, Ms. Oien, and those similarly situated that the Rose Stem Cell Products "regenerate[]" and "rejuvenate[]"; and

    f.   falsely representing to Ms. Clair, Ms. Oien, and those similarly situated that the Rose Stem Cell Products "stimulate cellular turnover for younger looking skin."

g.  engaging in fraud and negligent misrepresentation as described herein;

277.    Defendants intended for Plaintiffs and the Class members to rely on the unlawful, fraudulent, and/or unfair business acts and practices alleged herein.

278.    Plaintiffs and those similarly situated relied to their detriment on Defendants' unfair, deceptive and unlawful business practices. Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by not purchasing (or paying less for) Defendants' Products.

279.    Defendants' acts and omissions are likely to deceive the general public.

280.    Defendants' actions, which were knowing, willful, and wanton, constitute intentional violations of the Consumer Protection Acts.

281.    Defendants engaged in these unfair practices to increase their profits.

282.    Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by the Consumer protection Acts.

283.    The aforementioned practices, which Defendants have used to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

284.    Plaintiffs seek, on behalf of those similarly situated, full damages, as necessary and according to proof, to restore any and all monies acquired from Plaintiffs, the general public, or those similarly situated by means of the unfair and/or deceptive trade practices complained of herein, plus interest thereon. Plaintiffs also seek to recover attorneys' fees, costs, and expenses to be assessed against Defendants, within the limits set forth by applicable law.

285.    Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit Defendants from continuing to engage in the unfair trade practices complained of herein.

286.    Plaintiffs and those similarly situated are further entitled to and do seek both a declaration that the above-described trade practices are unfair, unlawful and/or fraudulent. Plaintiffs also seek injunctive relief restraining Defendants from engaging in any of such deceptive, unfair and/or unlawful trade practices in the future and prohibiting Defendants from offering the Rose Stem Cell Products and Water Drench Products within a reasonable time after entry of judgment, unless Defendants modify the Website and other marketing materials to remove the misrepresentations and to disclose the omitted facts identified in the Class Action Complaint. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate Consumer Protection Acts, unless specifically ordered to comply with the same. This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled. Plaintiffs, those similarly situated and/or other consumers have no other adequate remedy at law to ensure future compliance with the Consumer Protection Acts alleged to have been violated herein.

287.    As a direct and proximate result of such actions, Plaintiffs and the other members of the Classes have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the Classes lost the amount they paid for the Products.

288.    As a direct and proximate result of such actions, Defendants have enjoyed, and continue to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

289.    On or about May 3, 2018, another consumer, in a similar action pending in California, gave notice and demand that Defendants correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein with respect to the Water Drench Products and Rose Stem Cell Products.

290.    Defendants failed to do so in that, among other things, they failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and provide that remedy

291.    The letter described the above-referenced unfair and deceptive acts and practices, set forth the nature of the Classes' injuries, and requested relief from Defendants within 30 days.

292.    The demand letter satisfies any notification or presentment requirements under the Consumer Protection Acts.

293.    Alternatively, providing notice to Defendants would have been futile in light of Defendants' failure to adequately respond to this letter.

## PLAINTIFFS' FOURTEENTH CAUSE OF ACTION

**(Violation of Consumer Protection Statutes (New York General Business Law ("NYGBL) §§ 349 & 350, Florida Statutes ("Florida Deceptive and Unfair Trade Practices Act") § 501.201 et seq., and Washington Revised Code § 19.86.010 et seq (Unfair Business Practices – Consumer Protection))**

**On Behalf of Ms. McDonald, Ms. Clair, Ms. Oien, and the Water Drench Cell Class**

294.    Plaintiffs reallege and incorporate the above paragraphs of this Complaint as if fully set forth herein.

295.    Plaintiffs bring these claims on behalf of the Classes for violation of the consumer protection acts of Florida, New York, and Washington.

296.    Plaintiffs bring these statutory consumer protection claims pursuant to the substantially similar "Consumer Protection Acts" identified below, all of which were enacted and designed to protect consumers against unlawful, fraudulent, and/or unfair business acts and practices.

297.    The following consumer protection acts are collectively referred to herein as the "Consumer Protection Acts":

      a.   FLA. STAT. ANN. § 501.201 et seq. (Florida);

      b.   N.Y. GEN. BUS. LAW. § 349 et seq. (New York);

      c.   N.Y. GEN. BUS. LAW § 350 et seq. (New York);

      d.   WASH. REV. CODE ANN. § 19.86.010 et seq. (Washing-ton);

298.    Plaintiffs and members of the Classes have standing to assert claims under the Consumer Protection Acts because they are consumers within the meaning of the Consumer Protection Acts and Defendants' practices were addressed to the market generally and otherwise implicate consumer protection concerns.

299.    Defendants have engaged in and continue to engage in the unfair, unlawful and deceptive trade practices outlined in this Class Action Complaint.

300.    Within four years preceding the filing of this Class Action Complaint, and at all times mentioned herein, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices throughout the nation by carrying out the unfair, deceptive and unlawful business practices outlined in this Class Action Complaint.

301.     In particular, in connection with the marketing of the Water Drench Products, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices by, without limitation, the following:

a.  falsely representing to Plaintiffs and those similarly situated that the hyaluronic acid in the Water Drench Products "attracts and retains up to 1,000 times its weight in water from moisture in the atmosphere";

b.  falsely representing to Ms. Clair, Ms. McDonald, and those similarly situated that the hyaluronic acid in the Water Drench Products "transforms atmospheric vapor into fresh, pure water from the clouds";

c.  falsely representing to Ms. Clair, Ms. McDonald, and those similarly situated that the hyaluronic acid in the Water Drench Products provides skin "with a continuous burst of intense hydration that lasts up to 72 hours";

d.  falsely representing to Plaintiffs and those similarly situated that the hyaluronic acid in Defendants' products "draws water vapor from the clouds to help lock in moisture";

e.  falsely representing to Ms. McDonald, Ms. Clair, , and those similarly situated that the Water Drench Products "transform[] atmospheric vapor into fresh, pure water from the clouds, providing your skin with a continuous burst of intense hydration that lasts up to 72 hours."

f.  falsely representing to Ms. Oien and those similarly situated that the Water Drench Products provide "pure, plumping water continuously drawn from the clouds."

g.  engaging in fraud and negligent misrepresentation as described herein;

302.     Defendants intended for Plaintiffs and the Class members to rely on the unlawful, fraudulent, and/or unfair business acts and practices alleged herein.

303.     Plaintiffs and those similarly situated relied to their detriment on Defendants' unfair, deceptive and unlawful business practices. Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by not purchasing (or paying less for) Defendants' Products.

304.     Defendants' acts and omissions are likely to deceive the general public.

305.     Defendants' actions, which were knowing, willful, and wanton, constitute intentional violations of the Consumer Protection Acts.

306.     Defendants engaged in these unfair practices to increase their profits.

307.     Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by the Consumer protection Acts.

308.     The aforementioned practices, which Defendants have used to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

309.     Plaintiffs seek, on behalf of those similarly situated, full damages, as necessary and according to proof, to restore any and all monies acquired from Plaintiffs, the general public, or those similarly situated by means of the unfair and/or deceptive trade practices complained of herein, plus interest thereon. Plaintiffs also seek to recover attorneys' fees, costs, and expenses to be assessed against Defendants, within the limits set forth by applicable law.

310.     Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit Defendants from continuing to engage in the unfair trade practices complained of herein.

311.    Plaintiffs and those similarly situated are further entitled to and do seek both a declaration that the above-described trade practices are unfair, unlawful and/or fraudulent. Plaintiffs also seek injunctive relief restraining Defendants from engaging in any of such deceptive, unfair and/or unlawful trade practices in the future and prohibiting Defendants from offering the Water Drench Products within a reasonable time after entry of judgment, unless Defendants modify the Website and other marketing materials to remove the misrepresentations and to disclose the omitted facts identified in the Class Action Complaint. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate Consumer Protection Acts, unless specifically ordered to comply with the same. This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled. Plaintiffs, those similarly situated and/or other consumers have no other adequate remedy at law to ensure future compliance with the Consumer Protection Acts alleged to have been violated herein.

312.    As a direct and proximate result of such actions, Plaintiffs and the other members of the Classes have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the Classes lost the amount they paid for the Products.

313.    As a direct and proximate result of such actions, Defendants have enjoyed, and continue to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

314.    On or about May 3, 2018, another consumer, in a similar action pending in California, gave notice and demand that Defendants correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein with respect to the Water Drench Products.

315.    Defendants failed to do so in that, among other things, they failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and provide that remedy

316.    The letter described the above-referenced unfair and deceptive acts and practices, set forth the nature of the Classes' injuries, and requested relief from Defendants within 30 days.

317.    The demand letter satisfies any notification or presentment requirements under the Consumer Protection Acts.

318.    Alternatively, providing notice to Defendants would have been futile in light of Defendants' failure to adequately respond to this letter.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against Defendants and in favor of Plaintiffs, and grant the following relief:

A.    Determine that this action may be maintained as a Class action with respect to the Classes identified herein and certify it as such FRCP Rule 23 or alternatively certify all issues and claims that are appropriately certified, and designate and appoint Plaintiffs as Class

Representatives of their respective classes, and Plaintiffs' counsel as Class Counsel;

B.      Declare, adjudge and decree the conduct of the Defendants as alleged herein to be unlawful, unfair and/or deceptive;

C.      Enjoining Defendants, directly or through any company, corporation, partnership, subsidiary, division, trade name, or other device, in connection with the manufacturing, labeling, packaging, advertising, promotion, offering for sale, sale, or distribution of any product containing hyaluronic acid, from making a representation about the product's or ingredient's ability to hold, retain, or absorb water in any quantity and from any source unless, at the time the representation is made, Defendants possess and rely upon competent and reliable evidence, that, when considered in light of the entire body of relevant and reliable evidence, is sufficient in quantity and quality based on standards generally accepted in the relevant fields, to support such representation. For the purposes of this paragraph, "competent and reliable evidence" means tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by qualified persons, using procedures generally accepted in the profession to yield accurate and reliable results.

D.      Enjoining Defendants, directly or through any company, corporation, partnership, subsidiary, division, trade name, or other device, in connection with the manufacturing, labeling, packaging, advertising, promotion, offering for sale, sale, or distribution of any product containing plant stem cells, from making a representation about the product's or plant stem cells' ability to repair, rejuvenate, revitalize or otherwise improve the skin unless, at the time the representation is made, Defendants possess and rely upon competent and reliable evidence, that, when considered in light of the entire body of relevant and reliable evidence, is sufficient in

quantity and quality based on standards generally accepted in the relevant fields, to support such representation. For the purposes of this paragraph, "competent and reliable evidence" means tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by qualified persons, using procedures generally accepted in the profession to yield accurate and reliable results.

E.      Enjoining Defendants, directly or through any company, corporation, partnership, subsidiary, division, or other device, in connection with the manufacturing, labeling, packaging, advertising, promotion, offering for sale, sale, or distribution of any cosmetic product, to not provide to others the means and instrumentalities with which to make any representation prohibited by Paragraphs C and D above. For the purposes of this paragraph, "means and instrumentalities" means any information, including, but not necessarily limited to, any advertising, labeling, or promotional, sales training, or purported substantiation materials, for use by trade customers in their marketing of such product or service.

F.      Award Plaintiffs and the Class actual, compensatory damages, as proven at trial;

G.      Award Plaintiffs and the Class restitution of all monies paid to Defendants as a result of unlawful, deceptive, and unfair business practices;

H.      Award Plaintiffs and the Class exemplary damages in such amount as proven at trial;

I.      Award Plaintiffs and the Class reasonable attorneys' fees, costs, and pre- and post-judgment interest; and

J.      Award Plaintiffs and the Class such other further and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

**Jury Trial Demand**

Plaintiffs demand a trial by jury.

Respectfully submitted,

Dated: February 11, 2020.          **GUTRIDE SAFIER LLP**

_s/Stephen M. Raab_
Stephen M. Raab
113 Cherry Street, #55150
Seattle, WA 98140-2205
Telephone: (415) 639-9090 x109
stephen@gutridesafier.com

Attorneys for Plaintiffs